**Louise PARROTT, individually and in her official capacity as Administratrix of the Estate of Jeffrey Parrott, deceased, Plaintiff-Appellant,**

v.

**Max V. WILSON, etc., et al., Defendants-Appellees.**

**Nos. 81–7843, 82–8679.**

United States Court of Appeals, Eleventh Circuit.

June 23, 1983.

**18.** *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

J.M. Raffauf, Decatur, Ga., for plaintiff-appellant.

James A. Goldstein, Jr., Douglas B. Warner, Griffin Patrick, Jr., Patrick & Warner, P.C., Atlanta, Ga., for defendants-appellees.

Before JOHNSON and ANDERSON, Circuit Judges, and HUNTER *, District Judge.

* Honorable Edwin F. Hunter, Jr., U.S. District Judge for the Western District of Louisiana, sitting by designation.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, Louise Parrott, Administratrix of the Estate of Jeffrey Parrott, brought this § 1983[1] action against Max V. Wilson and James E. Paugh, Deputy Marshals of the State Court of Fulton County, and assorted county officials alleging that the fatal shooting of her son Jeffrey Parrott by Marshal Wilson constituted a deprivation of federally protected rights. Appellant also appended state claims for trespass and wrongful eviction. After the presentation of her case, the court below entered judgment in favor of all defendants. After careful consideration of the multitude of issues raised on this appeal, we affirm.

## I. FACTS

Our examination of the record discloses the following sequence of events. Mr. Frank L. Johnson owned a small house on Campbellton Road in Atlanta, Georgia. Beginning in 1971, he rented this house to Kenny Howell. Toward mid-summer of 1977, Howell fell behind in his rent payments. After attempting to work the problem out with Howell, Johnson instituted formal eviction proceedings in August of 1977. Sometime in late August or early September, Deputy Marshals Wilson and Paugh served notice of the impending eviction by tacking the eviction notice to the door of the Campbellton Road residence. At that time they were informed by an unidentified youth that Howell no longer lived there, but that someone else lived in the house who had stated an intention to ignore the eviction. Soon after the Marshals served the eviction notice, Johnson himself went to the Campbellton Road residence to perform some repairs. While there another young man, apparently Jeffrey Parrott, came out of the house and placed the eviction papers on the windshield of Johnson's car, saying that he had no intention of either leaving or paying any rent. Johnson did not inform the Marshals of this encounter. The evidence is fairly persuasive, however, that Johnson had neither rented the residence to Parrott nor previously been aware of his presence on the property.

At approximately 10:00 a.m. on the morning of September 9, Johnson met Wilson and Paugh at the Campbellton Road residence to effect the eviction. At that time he told the Marshals that although he did not think anyone was in the house he was not sure. The Marshals stated that they would need some help emptying the house of its furniture, whereupon Johnson left to secure the necessary labor.

Upon Johnson's departure, Wilson and Paugh attempted to gain entry to the house. After knocking and identifying themselves as Marshals, they unsuccessfully attempted to open the front door. At this point Wilson apparently told Paugh to check the back of the house while he checked the side. According to both Marshals, in proceeding around the house they shouted out their identities and their purpose several times, to no avail. While Paugh was at the back of the house Wilson located a side door, forced it open, and entered into a living room area. Wilson testified that after entering the house he heard music playing at a very low volume; he therefore pulled his gun. After examining the kitchen to his immediate left, Wilson holstered his gun and stepped back into the living room where he was confronted by Jeffrey Parrott. Parrott was armed with a sawed-off shotgun which he aimed directly at Wilson.

According to Wilson, Parrott accused him of breaking into the house and stated his intention to blow Wilson's head off.[2] While

---

1. 42 U.S.C.A. § 1983 (West 1981).

2. Wilson and Paugh both testified that at the time of the incident they were not wearing a uniform but were wearing civilian clothes. Their only identification was a marshal's badge, which was concealed. In addition, they had arrived at the residence in an unmarked county car. On the other hand, Wilson and Paugh both testified that they had repeatedly identified themselves as Marshals both prior to and subsequent to entering the residence. Further, Wilson testified that the eviction notice he had served by tack service on the outside of the

Wilson was attempting to persuade Parrott to leave peacefully, Marshal Paugh entered through the side door. Parrott then shifted his position slightly in order to cover both Wilson and Paugh with the shotgun. At about this time, Frank Johnson returned with two men to help him move the furniture. Wilson and Paugh both testified that upon noticing Johnson's arrival Parrott stated that if Johnson had been the one who had entered the house Parrott would have "blowed his head off." Hearing this, Wilson told Paugh to go outside and warn Johnson not to come near the house. Parrott apparently did not object to Paugh's leaving the house but refused to let Wilson leave.[3]

According to Johnson and his two assistants, Wardell Sharp and John Godfrey, soon after they arrived at the residence Paugh came out of the house and told them that there was a man in the house with a gun and that he had threatened to kill Johnson. Soon after Paugh conveyed the warning to Johnson, three shots rang out.[4] At this, Marshal Paugh cautiously headed back toward the house, whereupon Wilson came out of the door with Parrott's shotgun in his hand.

Wilson's precise words and actions upon leaving the house were a matter of some dispute. According to Paugh, Wilson's first statement was "I shot the man in self defense," and then Wilson broke down the shotgun to determine whether it was loaded. According to Sharp, when Wilson came out of the house he threw the shotgun on the ground and said "I guess the son-of-a-bitch is dead now." Godfrey testified that Wilson apparently had already broken the shotgun down when he came out of the house and that he held two shells in his hand.[5]

The only living witness to the events that actually transpired inside the house after Paugh's departure was Marshal Wilson. He testified that after Paugh left the house he continued his attempts to talk Parrott out of resisting the eviction. At all times Parrott had the shotgun aimed directly at Wilson, and Parrott continued to assert that he would not leave the property. Soon Parrott began to back up towards an entrance to a bedroom. Wilson could see that immediately to one side of the doorway was a bed with an iron railing; he could not see the entire bed. Upon reaching the doorway Parrott leaned towards the bed, apparently reaching for something outside of Wilson's line of vision. The shotgun remained trained directly on Wilson. Wilson stated that he believed Parrott was reaching either for another gun or for shells. With Parrott momentarily distracted Wilson drew his gun and fired three rounds rapidly at Parrott. Wilson saw the first round strike Parrott in the chest, spinning him

house was lying by the fireplace in the living room. Finally, at the time of the confrontation, Parrott referred to Wilson as a "pig." The evidence thus indicates that Parrott knew the "intruders" were officials, and not merely burglars.

3. According to the statement Wilson made to the police, he told Parrott "I am going to go and talk with Mr. Johnson and ask him if he will let you move by yourself." Parrott stated "you are not going anywhere, you are staying here." Exhibit 4 attached to Deposition of Max V. Wilson.

4. There is some dispute as to how soon after Paugh's leaving the house the shooting occurred. Johnson stated in his deposition that he heard the shots approximately 10 to 15 minutes after Paugh's warning. Godfrey testified that "it was probably a couple of minutes" after Paugh came outside. Sharp testified that Paugh was outside "about 5 or 6 minutes"

before the shots were fired. Sharp also testified that while he was outside Paugh stated "my partner will kill him if he have to [sic]." Paugh himself testified that the shooting occurred about 3 minutes after he went outside. At no time *prior* to the shooting did Paugh attempt to call the Police Department for help.

5. A neighbor, Daisy Fountain, testified that she heard over a police scanner a report of the shooting, whereupon she went to the Campbellton Road residence. She alleged that after waiting awhile outside the house she witnessed Marshal Wilson leave the house laughing and twirling his gun around on his finger. No other witness testified to such behavior by Marshal Wilson. Further, it is clear that Fountain could not have witnessed Marshal Wilson's first departure from the house since the shooting was not *reported* until after he left the house.

around; the second round struck Parrott in the back and Wilson did not see the third round hit him. Wilson then picked up the shotgun and unloaded it as he exited the house.

According to Wilson, throughout the course of the incident there was a distance of several feet between Parrott and him. He stated that at the time of the shooting he was approximately 4 to 6 feet from Parrott, who had been backing up towards the bedroom door. However, Dr. Joseph L. Burton, the Fulton County Medical Examiner, testified that Parrott's chest wound indicated that from "muzzle to target would have been less than 12 inches." As for the back wound, Burton determined a "range of approximately 24 inches, plus or minus 4 to 6 inches." Burton also testified that the bullets which struck Parrott's body apparently had been fired in rapid succession. Wardell Sharp, however, testified that there had been a pause between each shot.

After leaving the house subsequent to the shooting, Wilson and Paugh notified the police. No legal or disciplinary action was taken against the Marshals.

On September 7, 1979, Louise Parrott, the mother of the deceased, filed her complaint under 42 U.S.C.A. § 1983 (West 1981),

alleging that defendants' actions deprived Jeffrey Parrott of life and liberty without due process and equal protection of the law. Appellant also asserted pendent state claims for trespass and wrongful eviction.[6] The theory of liability as to Marshals Wilson and Paugh was that the use of unreasonable deadly force deprived Parrott of his constitutional rights. As to the Fulton County defendants, appellant alleged that Parrott's death was the result of a policy or custom officially adopted by the County, and that the County defendants were guilty of gross negligence in failing properly to train and supervise Deputy Marshals.[7] The defendants' primary defense was that Marshal Wilson was legally justified in using deadly force against Parrott.

After lengthy discovery, which was extended by stipulation on many occasions, this cause was heard by the court sitting without a jury in September of 1981. At the close of plaintiff's case, the district court expressly found that the defense of justification had been proved and therefore entered judgment for all of the defendants. From this judgment plaintiff appeals, asserting myriad errors on the part of the trial court. Several of these assertions deserve discussion.[8]

---

6. The original defendants in this action were Marshals Wilson and Paugh; former Chief Marshal of the State Court of Fulton County, Luke Davis; Fulton County; the Commissioners of the Board of Commissioners of Fulton County; Frank Johnson; and the surety for defendants Wilson, Davis and Paugh. Subsequently, Parrott moved to dismiss as party defendants Luke Davis and the surety since neither was a party in interest at the time of the incident. Immediately prior to trial in 1981, the plaintiff also dismissed her complaint against Frank Johnson without prejudice. Further, in her original complaint Louise Parrott asserted standing in her individual capacity as the mother of the deceased. Subsequently, the court dismissed her claim *sua sponte,* but allowed her to amend the complaint and proceed as the administratrix of Jeffrey Parrott's estate.

7. Virtually all of the evidence demonstrates that at the time of the incident the training program consisted of a six month period of on-the-job probation. Marshals were *not* instructed in the proper use of handguns, nor were applicants screened for psychiatric fit-

ness. On the other hand, there was no evidence of any episode involving the use of deadly force by a county marshal prior to the death of Parrott.

8. Judgment was rendered in this action on September 22, 1981, and appellant filed her appeal October 19, 1981. On September 17, 1982, during the pendency of this appeal, appellant filed a motion in the trial court to set aside the judgment because of fraud and misrepresentation by the defendants in withholding evidence of Wilson's mental disability some 12 years prior to the incidents in question. *See infra* note 17; Fed.R.Civ.P. 60(b)(3) & (6) (fraud, misrepresentation, misconduct, or any other reason justifying relief). The district court declined to pass on the merits of appellant's motion, stating that during the pendency of the appeal from the judgment it lacked jurisdiction over a Rule 60(b) motion. Appellant's appeal from this ruling, No. 82–8679, was consolidated with her appeal from the judgment.

Technically, the district court's jurisdictional ruling was incorrect. We have recognized the

## II. WAIVER OF TRIAL BY JURY

Appellant filed her complaint in September of 1979. At that time she did not request a trial by jury, to which she was otherwise entitled. On April 17, 1981, approximately a year and a half after the defendants answered her original complaint, appellant made her untimely request for a jury trial pursuant to Rule 39(b) of the Federal Rules of Civil Procedure.[9] Defendant Johnson formally opposed this motion on the ground that he would be seriously prejudiced because for many months he had structured his trial preparation in anticipation of a bench trial. He also alleged prejudice by virtue of the initial involvement of an insurance company as a party. At the time of appellant's motion, discovery had not ended and in fact would not end for several months; the actual date of trial was five months off. Nonetheless, the trial court denied appellant's motion.

■ In this circuit, the general rule governing belated jury requests under Rule 39(b) is that the trial court "should grant a jury trial in the absence of strong and compelling reasons to the contrary." *Swofford v. B & W, Inc.,* 336 F.2d 406, 408 (5th Cir.1964), *cert. denied,* 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965); *see Cox v. C.H. Masland & Sons, Inc.,* 607 F.2d 138, 144 (5th Cir.1979).[10] The district courts have broad discretion when considering Rule 39(b) motions and often freely grant such motions after considering (1) whether the case involves issues which are best tried to a jury;

(2) whether granting the motion would result in a disruption of the court's schedule or that of the adverse party; (3) the degree of prejudice to the adverse party; (4) the length of the delay in having requested a jury trial; and (5) the reason for the movant's tardiness in requesting a jury trial. *See, e.g., Cascone v. Ortho Pharmaceutical Corp.,* 94 F.R.D. 333 (S.D.N.Y.1982); *Pawlak v. Metropolitan Life Ins. Co.,* 87 F.R.D. 717 (D.Mass.1980); *Three Rivers Rock Co. v. Weathers Towing, Inc.,* 82 F.R.D. 623 (N.D.Miss.1979); *Priest v. Rhodes,* 56 F.R.D. 478 (N.D.Miss.1972); *Mississippi v. Hurst,* 41 F.R.D. 186 (N.D.Miss.1966). The decision by the district court to grant or deny the motion is therefore reversible by this court only for an abuse of discretion. Although the normal practice in the district court is to balance all of the factors enumerated above, when reviewing a lower court's denial of a belated jury request our cases require that appellant courts give considerable weight to the movant's excuse for failing to make a timely jury request. If that failure is due to mere inadvertence on the movant's part, we generally will not reverse the trial court's refusal to grant a 39(b) motion. *See Rhodes v. Amarillo Hospital District,* 654 F.2d 1148, 1154 (5th Cir. 1981); *Mesa Petroleum Co. v. Coniglio,* 629 F.2d 1022, 1029 (5th Cir.1980); *Bush v. Allstate Ins. Co.,* 425 F.2d 393 (5th Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 64, 27 L.Ed.2d 64 (1970); *accord United States v. Unum, Inc.,* 658 F.2d 300 (5th Cir.1981).[11] In the

---

discretionary power of a district court to consider such a motion even after an appeal has been noticed. *See Lairsey v. Advance Abrasives Co.,* 542 F.2d 928, 930 (5th Cir.1976); *Ferrell v. Trailmobile, Inc.,* 223 F.2d 697, 698–99 (5th Cir.1955). *See also* 11 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2873, at 265–66 (1973). The grounds alleged by appellant in support of her motion, however, are substantially identical to issues raised in her appeal from the judgment. *See infra* Section III. Further, we hold below that appellant has not sufficiently alleged misconduct on the part of the defendants with regard to evidence of past mental disability. We therefore conclude that the trial court's erroneous jurisdictional ruling was harmless error and therefore we affirm on other grounds the District Court's denial of relief in 82–8679.

**9.** Rule 39(b) states in part:
[N]otwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any or all issues.

**10.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**11.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34. Unit A cases after that date, such as *Unum,* are not binding on this court.

case before this court, appellant has nowhere stated the reasons for her failure to request a trial by jury within the time provided in Rule 38(b). Following the foregoing case law, we therefore will not reverse the trial court's ruling.

## III. UNAVAILABILITY OF DEPUTY MARSHAL WILSON AND DECISION TO ADMIT HIS DEPOSITION UNDER RULE 804(b)(1)

The only witness to the shooting of Jeffrey Parrott was Deputy Marshal Max Wilson. On or about July 1, 1981, counsel for the Fulton County defendants was informed by the Fulton County Marshal's office that Wilson had left his position as Deputy Marshal due to a mental disability. On July 17, counsel contacted Wilson's psychiatrist, Dr. Elmer H. Harden, Jr., and apparently was told that Wilson's disability might make him unavailable for the upcoming trial. Defense counsel then notified the appellant's attorney, and both parties deposed Dr. Harden on July 21, 1981.[12] At this time approximately two months remained before trial; discovery had formally ended, however, on July 17, 1981.

At his deposition Dr. Harden testified that Wilson had been referred to him by a neurologist on January 28, 1981. Dr. Harden found Wilson to be suffering from grand mal seizures, absence seizures, and dementia or serious depression.[13] According to Dr. Harden, the seizures could be controlled through medication and in fact their frequency had decreased substantially. On the other hand, he stated that there was no medication that could be used to control Wilson's dementia.

Dr. Harden did not have personal knowledge of the origin of Wilson's disorders. Rather, Wilson had told him that he had suffered a head injury in a fall in mid-1978. In December of 1978, he apparently suffered his first seizure and did not work for approximately two months. In the summer of 1980, the seizures recurred subsequent to an automobile accident and Wilson had not returned to work since that time. According to Dr. Harden, the types of seizures involved "would most definitely be of an organic basis."

Dr. Harden's prognosis for Wilson was somewhat bleak. He stated that in his opinion Wilson could not function in a stressful situation, and that because of Wilson's confusion and disorientation Dr. Harden would not "necessarily trust his memory at any time." Finally, Dr. Harden stated that it was extremely unlikely to expect any significant improvement within the next six months to a year and one-half.

On the basis of Dr. Harden's testimony, the defendants told appellant that they would move to have Wilson declared unavailable and to substitute for trial testimony a deposition by Wilson dated February 29, 1980. This deposition had been taken *after* Wilson's injury in mid-1978 but before the subsequent recurrence of seizures in the summer of 1980, and almost one year before he sought Dr. Harden's medical assistance.

At the scheduled pretrial conference on July 27, 1981, appellant therefore moved to reopen discovery for the following purposes: (1) to ascertain for herself the extent of Wilson's disorder; (2) to hire another expert to examine Wilson; and (3) to determine why she had not been informed of Wilson's condition at an earlier date. On September 11, the trial court formally declared Wilson unavailable, admitting his deposition under Rule 804(b)(1), and on the 15th, one day before trial, the court formally denied appellant's motion to reopen discovery.

■ Appellant now challenges both the decision to declare Wilson unavailable and the decision to admit Wilson's deposition

---

12. There is no evidence that counsel for the defendants either knew of Wilson's disability prior to July 1, or knew of the possibility he would be unavailable as a witness.

13. Dr. Harden specified that Wilson "was suffering from symptoms of overt feelings of dependency, loss of appetite, frequent crying spells, irritability, inability to enjoy himself or other people, decreased libido and severe insomnia." Apparently Wilson's neurologist continued to treat Wilson for the seizure disorders, while Dr. Harden's purpose was to attempt to treat Wilson for the dementia.

testimony under Rule 804(b)(1).[14] Our examination of Dr. Harden's deposition convinces us, however, that the trial court did not abuse its discretion in declaring Wilson unavailable: "The duration of the illness" was "in probability long enough so that, with proper regard to the importance of the testimony, the trial [could not] be postponed." *United States v. Amaya,* 533 F.2d 188, 191 (5th Cir.1976) (citing 5 Wigmore, Evidence § 1406(a) (Chadbourn rev. 1974)), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977).

■ With respect to the admission of Wilson's deposition in lieu of testimony, appellant argues that the defendants did not demonstrate Wilson's competence at the time of his deposition. Appellant adds that Dr. Harden's testimony demonstrates that at the time Wilson was deposed in February of 1980 Wilson already was suffering seizures and dementia. There are two answers to this contention. First, appellant did not raise in the court below the issue of Wilson's competence at the time of the deposition. Appellant raised this issue neither in her opposition to the defendant's motion to declare Wilson unavailable, nor in her motion during trial based on the revelation of Wilson's earlier episode involving mental health. *See infra* note 17; Record at 622–

23. Second, the testimony of Dr. Harden does not, in our view, support appellant's assertions.

Wilson's first injury occurred in mid-1978; his first seizure in December of 1978 occurred over one year *prior* to his deposition in February, 1980. Apparently, he missed only two months of work as a result of the first injury, and there is no evidence of dementia throughout this period. Further, Wilson's second injury, which led to a recurrence of his seizures, occurred in the summer of 1980, several months *after* his deposition. Moreover, not until January, 1981, when Dr. Harden began treating Wilson, was there any evidence regarding the dementia which led to Wilson's unavailability. Thus, at the most the evidence suggests only that Wilson may have been suffering grand mal or absence seizures during the period in which he was deposed. A careful reading of the deposition, however, makes it clear that such seizures did not occur during his examination. We therefore conclude that there is no factual basis for a challenge to the introduction of Wilson's deposition on the ground that he was incompetent at the time he was deposed.[15] Thus, the trial court did not abuse its discretion in admitting the deposition of Wilson in lieu of his testimony.

---

**14.** Rule 804(b)(1) allows the admission of testimony by a declarant who is unavailable as a witness when that testimony was:

given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Fed.R.Evid. 804(b)(1). Rule 804(a)(4) provides that unavailability may arise by virtue of "then existing physical or mental illness or infirmity."

**15.** In arguing that the defendants did not meet their burden of proving Wilson's competence at the time of the deposition, appellant relies on *Huff v. White Motor Corp.,* 609 F.2d 286 (7th Cir.1979). That case, however, is clearly distinguishable. *Huff* involved the admissibility of a statement made by an accident victim while hospitalized for an injury from which he eventually died. The defendant attempted to have the statement introduced under the residual hearsay exception of Rules 803(24) and

804(b)(5). The trial court excluded the statement by the decedent. On appeal, the Ninth Circuit reversed and remanded to allow admission of the statement conditioned upon the proponent's proving by a preponderance of the evidence the mental capacity of the decedent at the time he made the statement. Significantly, however, there was direct testimony to the effect that during the decedent's hospitalization "he was not physically able to carry on a conversation," and that "he didn't seem to know what was going on." *Id.* at 292–93 & n. 10. In contrast, there is no evidence in the instant case of Wilson's similar incapacity *at the time of the deposition.* Moreover, we are concerned here not with the residual hearsay exception, for which the proponent must prove circumstantial guarantees of trustworthiness, but with the introduction of prior testimony, which necessarily involves cross-examination under oath by a party with a similar motive for exploring the truth of the declarant's statements.

Appellant's reliance on cases under Rule 804(a)(3) involving lack of memory, in which the witness *must testify* as to his inability to remember, is similarly misplaced. The require-

Appellant next contends that the trial court erred in denying her motion to reopen discovery for the purpose of informing herself as to Wilson's condition. The defendants argue, however, that at the pretrial conference on July 27, 1981, the court stated that appellant *would* be allowed additional discovery by means of *deposition;* if this is true, then appellant had well over a month and a half in which to discover the information she deemed necessary to her case. Appellant does not directly dispute this contention. In fact, the record convinces us that the defendants' version of the pretrial conference is an accurate one. First, the docket entry for July 27, 1981, states: "Court denied motion to add party and motion to reopen discovery, court will enter order on motion for S.J., *deposition may be taken subject to rule up until trial.*"

Record at 7 (emphasis added). Second, appellant's counsel sent a letter to the trial court one week after the pretrial conference. That letter makes clear that the appellant did have an opportunity to conduct limited discovery concerning Wilson's physical and mental condition.[16] Thus, during the time between the pretrial conference and the formal denial of appellant's motion on September 15, appellant was afforded the discovery opportunity she requested; she simply failed to make use of that opportunity. We conclude that there is no merit in appellant's argument that the trial court abused its discretion in refusing to reopen discovery.[17]

## IV. ATTORNEY WORK PRODUCT

During the course of discovery, defendants became aware that appellant's at-

---

ment of testifying is necessary to establish the sincerity of the witness's belief that he cannot remember. *See* 4 Weinstein's Evidence ¶ 804(a)[01] (1979). In contrast, unavailability under Rule 804(a)(4) due to physical or mental infirmity is based on the declarant's inability for medical reason to withstand the rigors of testifying at trial. This type of unavailability generally will preclude the physical presence of the declarant at trial. *See id.*

Of course, Wilson's deposition is admissible under Rule 804(b)(1) only if appellant had an adequate opportunity for cross-examination. Appellant has not argued that her cross-examination at the deposition was inadequate because she did not know at that time of Wilson's mental problems. Although we need not address the issue, we doubt its merit in any event since there is no indication of any mental deficiency either at the time of the incident or at the time of the deposition which would have affected the substance of Wilson's testimony. At most, such cross-examination would have related to the collateral matter of credibility. *See United States v. Monaco,* 702 F.2d 860, 871 (11th Cir.1983); *Thomas v. Cardwell,* 626 F.2d 1375, 1386 n. 34 (9th Cir.1980), *cert. denied,* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981).

16. This letter states:

At the pretrial conference last Monday I stated I would inform you of our intentions as to the discovery needed concerning Max V. Wilson. You may recall that the defendants allege that Wilson will be unable to testify at trial. *At this time my clients are unable to hire an expert to examine him.* We reserve the right to do so in the future. We also intend to subpoena him for trial. *And we plan to seek further discovery into his condi-*

tion any [sic] facts as to why we were not informed of his condition until after discovery had expired.

Record at 579 (emphasis added).

17. The controversy surrounding Wilson's mental condition was aggravated by appellant's discovery during trial that Wilson had suffered a similar disorder in 1965. Prior to his employment as a Fulton County Deputy Marshal, Wilson had been employed as a police officer by the City of Forrest Park. During his employment at Forrest Park, Wilson was involved in an automobile accident in which he suffered serious head injuries. At trial, Joe F. Pikard, the Director of Public Safety for the City of Forrest Park since 1964, produced Wilson's Forrest Park employment file. This file contained a letter dated June 18, 1965, in which Wilson's attending physician told Pikard that as a result of the accident Wilson was suffering from cerebral concussion with acute brain syndrome and acute loss of memory, "but that Wilson was expected to recover completely in due time." Wilson did return to work in early 1966 but on July 20, 1966, submitted his resignation effective July 29. Information in the file demonstrates that Wilson resigned. Pikard testified that it was probably a "requested" resignation, however, and Wilson's discharge notice, prepared by his supervisor, states "this is a good man but cannot be utilized in police department." Alleging that this surprising evidence demonstrated that Wilson had suffered from a mental disability since 1965, appellant moved for a mistrial or a continuance, urging as alternative grounds newly discovered evidence and defendant's misconduct in failing to disclose the earlier disability. Both motions were denied, in our view, for good reason.

torney had clandestinely taped telephone conversations with Wardell Sharp and John Godfrey—two of the witnesses to the events which transpired outside the house on the morning that Jeffrey Parrott was shot. Defendants therefore moved to compel production of the taped conversations. Appellant objected on the ground that the tapes were attorney work product and hence subject to the protection of Rule 26(b)(3) of the Federal Rules of Civil Procedure. The court ordered disclosure of the tapes. Appellant here argues that the district court's ruling is reversible error. We reject this argument.

Recently, the United States Court of Appeals for the District of Columbia Circuit held that "in some circumstances, a lawyer's unprofessional conduct may vitiate the work product privilege." *Moody v. IRS,* 654 F.2d 795, 799–801 (D.C.Cir.1981); *see Moody v. IRS,* 682 F.2d 266, 268 (D.C.Cir. 1982) (same case after remand to district court). The court reasoned that the purpose of the work product privilege is to protect the integrity of the adversary process; therefore, it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process. 654 F.2d at 800. In the instant case, the record clearly demonstrates that counsel for the appellant clandestinely recorded conversations with witnesses. While this practice violates no law,[18] the Code of Professional Conduct imposes a higher standard than mere legality. The American Bar Association's Committee on Ethics and Professional Responsibility has ruled that the recording of conversations of witnesses without their consent is unethical. *See* ABA Committee on Professional Responsibility, Formal Opinions, No. 337 (1974);[19] *Id.,* Informal Opinions, No. 1320 (1975) (refusing to reconsider Formal Opinion No. 337). *See also* NYSBA, Committee on Professional Ethics, Opinions, No. 328 (1974).

We are mindful of the client's interest in protecting against the disclosure[20] of work product. However, we are unable to say that the disclosure in this case "traumatize[d] the adversary process more than the

---

No sooner had Pikard disclosed the contents of the file than the trial court discovered that the file *also* contained a letter from appellant's attorney, dated July 20, 1980, introducing an investigator whom he had sent for the express purpose of examining Wilson's file. Moreover, in the pretrial order, Pikard was listed by appellant as a potential witness. Thus, over one year prior to trial appellant's attorney had access to the file. Appellant does not deny this but asserts the lack of actual knowledge as to the file contents. Clearly, this does not excuse counsel's failure to exercise due diligence in conducting his investigation. *See, e.g., Rhodes v. Amarillo Hospital District,* 654 F.2d 1148, 1153 (5th Cir.1981); *American Lease Plans v. Silver Sand Co.,* 637 F.2d 311, 311 (5th Cir. 1981); *Kestenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564, 575 (5th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979).

Appellant also was not entitled to a mistrial or continuance on the basis of defendants' misconduct in withholding evidence. Appellant fails to direct us to any attempt prior to trial to discover evidence of previous mental disability of Wilson. As discussed above, appellant could have deposed Wilson as well as his attending neurologist after learning of the mental problems, but elected not to do so. Finally, we note that early in the litigation Wilson responded to an interrogatory directed at prior employment history by saying that he left Forrest Park to work for the Fulton County Marshal's Office. The record demonstrates that in fact Wilson was employed as a Marshal within one week of his resignation. Finding no misconduct on the part of defendants, we affirm the court's refusal to grant either a mistrial or a continuance.

**18.** Both Federal and Georgia law prohibit only clandestine taping by persons who are not parties to the conversations. *See* 18 U.S.C.A. §§ 2510–11 (West 1982); Ga.Code Ann. § 16–11–62 (1982); *State v. Birge,* 240 Ga. 501, 241 S.E.2d 213 (Ga.), *cert. denied,* 436 U.S. 945, 98 S.Ct. 2847, 56 L.Ed.2d 786 (1978).

**19.** ABA Opinion No. 337 relies on the "axiomatic norms" expressed by Canons 1, 4, 7 and 9; in particular, the Opinion states that such conduct is governed by DR 1–102(A)(4), which provides that "[a] lawyer shall not ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The Georgia Code of Professional Responsibility contains provisions identical to Canons 1, 4, 7 and 9, and DR 1–102(A)(4). *See* 2 Nat'l Rep. on Legal Ethics & Prof.Resp. [UPA] 11 (1982).

**20.** Disclosure is clearly an appropriate remedy when the evidence sought was *generated* directly by the attorney's misconduct. Moreover, had counsel informed the witnesses that he was taping the conversations, they would

underlying legal misbehavior." 654 F.2d at 801. The only discernible effect of the disclosure was that the depositions of Sharp and Godfrey commenced with the playing of the taped conversations. We thus hold that whatever work product privilege might have existed [21] was vitiated by counsel's clandestine recording of conversations with witnesses.[22]

## V. INVOLUNTARY DISMISSAL

At the close of plaintiff's case, defendants moved for involuntary dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The trial court made the requisite findings of fact, see Fed.R.Civ.P. 52, and found for the defendants. Appellant now seeks to overturn this judgment.[23]

■ In our view, there was substantial evidence from which the trial court could conclude that Deputy Marshal Wilson was justified in shooting Jeffrey Parrott.[24] The unrebutted testimony of both Wilson and Paugh established that when Wilson entered the residence he was accosted at gun-

have been entitled to transcripts under Rule 26(b)(3) of the Federal Rules of Civil Procedure. Finally, Sharp and Godfrey testified that had they known their conversations were being taped they would not have consented to an interview. Thus, but for counsel's misconduct the tapes would not have existed.

21. We expressly decline to determine whether the tapes were in fact work product material.

22. Appellant also argues that the district judge accused appellant's attorney of violating the law by taping these interviews, that the judge's impartiality thus might be reasonably questioned, and that the judge should have recused himself pursuant to 28 U.S.C.A. § 455 (West 1982). The court's refusal to recuse itself, however, may be reversed only for an abuse of discretion. See Weingart v. Allen & O'Hara, Inc., 654 F.2d 1096 (5th Cir.1981); Davis v. Board of School Comm'rs of Mobile County, 517 F.2d 1044 (5th Cir.1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). We conclude that the trial court's conduct, as alleged by appellant, did not rise to the level requiring recusal. See United States v. Gregory, 656 F.2d 1132, 1137 (5th Cir.1981) (exception to rule requiring extra-judicial source of bias exists only where movant demonstrates pervasive bias and prejudice); Phillips v. Joint Legislative Comm., 637 F.2d 1014, 1019 (5th Cir.1981) (allegations of bias must be based on extra-judicial conduct), cert. denied, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); Davis v. Board of School Comm'rs of Mobile County, 517 F.2d at 1052 (same).

23. In its order entering judgment for the defendants, the trial court characterized its ruling as a directed verdict. This characterization obviously was due to inadvertence on the part of the trial court; the defendants had made only a motion for involuntary dismissal, and the trial court clearly stated that it was ruling on the basis of defendants' motion.

Appellant contends that because she was entitled to a jury trial, the trial court should have treated the motion for involuntary dismissal as a motion for a directed verdict; under such a motion the trial court is obligated to consider the evidence and all inferences therefrom in the light most favorable to the nonmoving party. Had the trial court erroneously denied appellant a jury trial, this contention would be true. See Cox v. C.H. Masland & Sons, Inc., 607 F.2d 138, 144 n. 8 (5th Cir.1979). We have held, however, that appellant waived her right to a jury trial by failing to make a timely motion under Rule 38. See supra Section II. Thus, the trial court was entitled to weigh the evidence at the conclusion of appellant's case, and we can overturn the trial court's findings of fact only if they are clearly erroneous.

24. Under Georgia law, the defense of justification is a statutory one, see Ga.Code Ann. § 105–1801 (1968), and constitutes a complete defense to an action for wrongful death. It is not clear whether the trial court found justification as a matter of state law or solely as a matter of federal constitutional law. Nonetheless, there was sufficient evidence to prove the defense under both state and federal law. See Williams v. Kelley, 624 F.2d 695, 697 (5th Cir. 1980) (constitutionality of use of force rests on (1) need for force; (2) amount of force used; (3) extent of injury; (4) whether force was applied solely to cause harm), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981); Kickasola v. Jim Wallace Oil Co., 144 Ga.App. 758, 242 S.E.2d 483, 485 (Ga.App.) (jury could conclude that shooting resulted from fears of a reasonable man that his own life was in danger), cert. denied, 436 U.S. 921, 98 S.Ct. 2272, 56 L.Ed.2d 764 (1978).

Appellant's claims for wrongful eviction and trespass were premised upon the failure to provide 3 days notice of the eviction to Parrott. Until 1970, § 61–306 of the Georgia Code required such notice to a tenant prior to execution of an eviction. Section 61–307 provided that an officer violating the notice provision would be "deemed guilty of a trespass." In 1970, Ga.Code Ann. § 61–306 was superseded by a new section dealing with "Appeal." Section 61–307, however, remains on the books;

point by Parrott. Further, all witnesses to Marshal Wilson's exit' from the residence after the shooting testified that he carried with him a sawed-off shotgun, which apparently had been loaded. A laboratory examination disclosed that this shotgun was capable of being fired. In addition, testimony indicated that Parrott had been aware of the impending eviction and had demonstrated his unwillingness either to leave the residence or to pay the rent. *Compare Roberts v. Marino,* 656 F.2d 1112, 1114 (5th Cir.1981) *with Mariorana v. MacDonald,* 596 F.2d 1072, 1078–79 (1st Cir.1979). *See generally Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981). Appellant's case rests largely upon the coroner's report that Parrott had been shot from a closer range than that indicated by Wilson in his testimony. In addition, appellant points to testimony by its expert on police operations to the effect that Wilson and Paugh could have used other means to ensure a nonfatal end to this incident. This same expert, however, would not state categorically that the use of deadly force by Marshal Wilson was unjustified. We conclude, therefore, that the findings by the district court were not clearly erroneous.[25]

We have reviewed appellant's remaining contentions and conclude that they are without merit.[26] Accordingly, we affirm the judgment below in all respects.

AFFIRMED.

this section expressly refers to the "preceding" section, and the 3-day notice period. The appellant argues that § 61–307 therefore continues in effect the 3-day notice provision of former § 61–306. The trial court ruled, however, that the notice requirement had been completely repealed, and this seems to us the correct conclusion. In the alternative, the trial court ruled that there was no evidence to suggest that Jeffrey Parrott had attained the status of tenant with regard to Johnson. Under Georgia law, it is clear that Parrott was *not* a tenant. *See Liberty Loan Corporation of Lakewood v. Leftwich,* 115 Ga.App. 113, 153 S.E.2d 596, 598 (Ga.Ct.App.1967); *Edwards v. Gulf Oil Corp.,* 71 Ga.App. 649, 31 S.E.2d 677, 678 (Ga.App. 1944); Ga.Code Ann. § 61–101 (1979). Thus, appellant may not assert noncompliance with §§ 61–301, *et seq.* in attacking the eviction proceeding. *See Ihlanfeldt v. Courtney,* 132 Ga.App. 155, 207 S.E.2d 653, 653–54 (Ga.App. 1974) (dispossessory warrant will not lie unless relation of landlord and tenant exists); *Hardy v. Ramey,* 128 Ga.App. 875, 198 S.E.2d 360, 361–62 (Ga.App.1973) (same).

**25.** Similarly, we conclude that there is no basis for liability on the part of the County Commissioners for failure to screen applicants and to train and supervise Marshals. The record discloses no "affirmative link" between Wilson's actions and conduct by supervisory officials. *Hamrick v. Lewis,* 515 F.Supp. 983, 987 (N.D. Ill.1981); *see McLaughlin v. City of LaGrange,* 662 F.2d 1385, 1388 (11th Cir.1981), *cert. denied,* 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982); *Ford v. Byrd,* 544 F.2d 194, 195 (5th Cir.1976); *Sims v. Adams,* 537 F.2d 829, 831–32 (5th Cir.1976); *Berry v. McLemore,* 670 F.2d 30, 32–34 (5th Cir.1982); *Owens v. Haas,* 601 F.2d 1242, 1246–47 (2d Cir.1979); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976); *cf. Vasquez v. Snow,* 616 F.2d 217, 220 (5th Cir.1980); *Whitehurst v. Wright,* 592 F.2d 834, 838 (5th Cir.1979).

**26.** During discovery appellant propounded interrogatories requesting the facts underlying the various defenses asserted by the defendants. The defendants gave evasive and incomplete responses to these interrogatories, and for the most part simply referred the appellant to the information contained in their answer and in various depositions. The appellant then moved under Rule 37 to compel answers to these interrogatories, and the court granted the motion in part. Defendants complied with the order to compel by addressing certain of the interrogatories *en masse*. rather than by addressing each interrogatory individually. Appellant then moved to impose discovery sanctions, but the court denied the motion, stating that the answers were self-explanatory and constituted a complete response. Appellant now contends that the trial court abused its discretion in failing to order discovery sanctions and suggests that an order to strike the defense of justification would be proper.

We have examined the record carefully and have compared the defendants' answers to the interrogatories propounded. In our view, "the answers as a whole disclose a conscientious endeavor to understand the questions and to answer fully those questions as are proper." 8 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2177 (1970). The failure to address and respond to each particular interrogatory in this case does not rise to the level which would require this court to reverse the ruling by the district court. *See Britt v. Corporacion Peruana De Vapores,* 506 F.2d 927, 932 (5th Cir.1975). *Compare State Exchange Bank v. Hartline,* 693 F.2d 1350 (11th Cir.1982) *with EEOC v. Troy State University,* 693 F.2d 1353 (11th Cir.1982). Moreover, the specific sanc-

tion requested by the appellant, striking the defense of justification, would be tantamount to granting a motion for summary judgment in favor of the appellant. Such a remedy should remain a sanction of last resort, applicable only in the most extreme circumstances. *See, e.g., Aztec Steel Co. v. Florida Steel Corp.,* 691 F.2d 480, 481 (11th Cir.1982); *In re: Liquid Carbonic Truck Drivers Chemical, Etc.,* 580 F.2d 819, 822–23 (5th Cir.1978), *cert. denied,* 441 U.S. 945, 99 S.Ct. 2165, 60 L.Ed.2d 1047 (1979); *Emerick v. Fenick Industries,* 539 F.2d 1379, 1381 (5th Cir.1976).