**Duane MOODY, Plaintiff–Appellee,**

v.

**PEPSI–COLA METROPOLITAN BOTTLING COMPANY, INC., Defendant–Appellant.**

Nos. 89–1917, 89–2078.

United States Court of Appeals, Sixth Circuit.

Argued July 30, 1990.

Decided Sept. 20, 1990.

Rehearing and Rehearing En Banc Denied Nov. 6, 1990.

Martin J. Leavitt, Andrew W. Mychalow-
ych, Andrew J. Haliw, III (argued), Sulli-

van & Leavitt, Northville, Mich., for plaintiff-appellee.

Richard E. Lieberman, Mark N. Woyar (argued), Robert T. Zielinski, Ross & Hardies, Chicago, Ill., Gregory V. Murray, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for defendant-appellant.

Before MILBURN and GUY, Circuit Judges; and TIMBERS, Senior Circuit Judge.[*]

MILBURN, Circuit Judge.

Defendant-appellant Pepsi-Cola Metropolitan Bottling Company, Inc., ("Pepsi") appeals from an amended judgment entered on a jury verdict for plaintiff-appellee Duane Moody in this action alleging breach of contract under Michigan's *Toussaint* doctrine[1] and age discrimination in violation of both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and Michigan's Elliott–Larsen Civil Rights Act. For the reasons that follow, we affirm.

## I.

### A.

In the initial pleadings in this case, neither party demanded a jury trial. After the district court entered a scheduling order reflecting that the case was set for a non-jury trial, counsel for Moody filed a motion requesting a jury trial. The district court heard oral arguments and granted the motion for a jury trial indicating that it took Moody's actions as a waiver but not a fully informed one. However, to avoid possible prejudice to Pepsi, the district court granted it additional time for discovery.

The case was tried to a jury beginning on June 22, 1988, and the trial ended on July 6, 1988. Pepsi made timely motions for a directed verdict at the close of Moody's proof and at the close of all the evidence.

The jury returned a verdict in favor of Moody on all three claims and awarded $300,000 in economic losses. The jury also awarded $150,000 for emotional distress under the Elliott–Larsen claim.

Judgment was not entered until March 28, 1989. On April 6, 1989, Moody filed a motion for a partial new trial and/or amendment of the judgment. On April 11, 1989, Pepsi filed a motion for a judgment notwithstanding the verdict ("JNOV") or, alternatively, for a new trial. On June 29, 1989, the district court entered an order generally denying the post-trial motions of both parties; however, it decreased the economic loss award from $300,000 to $184,-038.

On July 14, 1989, Pepsi filed a motion for reconsideration by the district court of its June 29, 1989, order denying the JNOV and new trial. Specifically, Pepsi asked for further reduction of the economic loss award.[2] While the motion for reconsideration was still pending, Pepsi filed a notice of appeal (No. 89–1917) to this court on July 28, 1989. On August 25, 1989, the district court, in response to the motion for reconsideration, entered an order reflecting a reduction of the economic loss award to $132,818.

Since the notice of appeal was filed while a motion for reconsideration was pending, this court issued a show cause order on the issue of jurisdiction dated September 5, 1989. Pepsi not only submitted a response, but also filed a second notice of appeal (No. 89–2078). On October 17, 1989, this court discharged the show cause order and consolidated the cases reasoning that one of the two notices conferred jurisdiction.

### B.

This action arises out of Duane Moody's discharge from the job of warehouse manager of Pepsi's facility in Romulus, Michigan, on October 29, 1982. Moody was fif-

---

[*] Honorable William H. Timbers, Senior Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

1. *See Toussaint v. Blue Cross and Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980).

2. The district court's docket sheet shows the motion to have been made by the plaintiff; however, documents filed with this court indicate that it was Pepsi, rather than the plaintiff, that asked for reconsideration of the June 29, 1987, order.

ty-two years old at the time of the discharge. The man who assumed the top managerial position at the warehouse was twenty-nine.

At trial, both Moody and his wife testified that Moody suffered emotional distress from the termination. Moody testified that as he left the job he was humiliated and in a state of shock and disbelief. Moody testified that part of the humiliation was from his being "escorted off by a guard [that was his subordinate] just the day before." J.A. 138. Moody was forced to take a job that was offered to him as a favor and eventually had to move to Florida and reside away from his family for a year in order to maintain employment. Moody testified that he felt his marriage suffered from the separation.

Moody's wife testified that Moody was upset to the point of crying following his discharge. Every time Moody went job hunting, he came home more dejected than before. Mrs. Moody was afraid her husband would "go off the deep end." Mrs. Moody testified that her husband still cries as he "never really pulled out of it." J.A. 185.

Moody was earlier employed by Pepsi in the 1950's until he began working for a competitor. He returned to Pepsi in 1977 and was told that he could work until retirement if he performed competently. Moody's performance reports from 1977 until 1981 were above average and often commented favorably upon his knowledge of labor relations and his firm and fair approach to his department. One report specifically noted that because of Moody's management there had not been a single grievance that year. J.A. 77. However, the final appraisal of Moody for the year he was discharged criticized his "high turnover of subordinates" and criticized his management style as "too domineering and intimidating." J.A. 112.

The latter comments came from Ed Koltalo who became Moody's supervisor in April of 1982. Koltalo was Pepsi's principal witness in this case; however, he was called as a witness by both sides. Koltalo testified that Moody was terminated be-

cause of a reduction in force in which higher management ordered elimination of six management people because of a significant decrease in sales volume. The record verifies the claimed decrease in sales; however, the record leaves room for doubt as to the alleged reduction in force.

For example, after testifying as a witness for Pepsi, Koltalo was cross-examined, with the aid of Pepsi's organizational charts, concerning the alleged reduction in force. Koltalo admitted that for periods before Moody's termination, the charts showed forty employees, and for periods after Moody's termination, the charts showed thirty-nine employees. Thus, if Moody were reinstated, the number of employees after the alleged reduction in force would be the same as before. J.A. 238.

During cross-examination, Moody's counsel also explored Koltalo's claim that as a supervisor, Moody had a turnover rate of 100 percent. It was established on cross-examination that two of the employees referred to as turnovers left years after Moody did. J.A. 242. The other two were terminated for legitimate reasons by Moody's superiors.

Before Moody's termination there were three managerial positions at the warehouse; manager 1 (Moody—age 52), manager 2 (James Becker—age 29), and supervisor (James Blank—age 30). Koltalo testified that it was his decision that the managerial jobs should be consolidated. From the record it appears that after Moody's termination, only two of the three managerial positions at the Romulus warehouse were occupied.

The man who assumed the top managerial position was James Becker. Becker was hired in July of 1982; Moody was terminated in October of the same year. Koltalo testified that he decided Becker should be retained over Moody because of Becker's superior employee relations skills. This factor was especially important, according to Koltalo, because of an ongoing strike at the facility and previous complaints of mistreatment from Moody by his subordinates.

However, Becker admitted having doubts about his experience and proficiency regarding several aspects of the job. Becker's on-the-job training was limited to approximately one month by the intervening strike.

During his case-in-chief, Moody called as a witness, Robert Bobbitt, a former regional manager for Pepsi whose duties were much the same as Koltalo's. Bobbitt testified that the company followed a human resource plan, the purpose of which was to plan the development of each Pepsi employee. Bobbitt also verified the existence of a "Crew Program" designed to recruit "persons right out of college" to become top managers. J.A. 198. The record reflects that under the Crew Program, nine persons were hired in 1982 prior to Moody's termination. J.A. 72.

Bobbitt also testified that he was present at a meeting with Koltalo and Mr. Muldoon, a superior from Pepsi's New York headquarters. According to Bobbitt, Muldoon ordered Koltalo to "terminate Duane Moody." J.A. 192. Koltalo resisted by arguing that he had not yet gathered enough documentation; however, Muldoon insisted on the termination. Under cross-examination, Bobbitt admitted that he, as an area manager, participated in a reduction in force in 1982.

Koltalo admitted the Muldoon conversation but presented a different version. According to Koltalo, he made the decision to terminate Moody and consulted Muldoon only for his concurrence.

Under examination by Moody's counsel as an adverse witness, Koltalo was asked to explain some documents entitled "1982 Personnel Plans." The documents were introduced as plaintiff's exhibit 8, and beside Moody's name in one document was the entry "(Age)". Several other names were listed in the document accompanied by entries such as "(Minority)" and "(Black/Female)". The document showed Moody to have been "Outcounseled/Outplaced."

Koltalo explained that the term "outcounseled" meant that an employee was not effectively doing his job and had to be counseled. "Outplaced" meant that counseling was unsuccessful and the employee had to be removed from the job. Thus, Koltalo admitted that plaintiff's exhibit 8 showed that Moody was terminated because he was not effectively doing his job. However, Koltalo later testified that he was uncomfortable with terminating Moody. Koltalo further admitted that at the time he received orders from above, he was "not even thinking about" outcounseling or outplacing Moody.

When Pepsi called Koltalo as a witness, he explained that the entries "(Age)" and "(Minority)" on the personnel documents did not reflect the motivation behind the personnel actions. In fact, Koltalo testified that age played no part in Moody's termination. Koltalo said that the documents labeled personnel plans were not really plans at all but were prepared after the fact. The entries "Age," "Minority," etc., were intended to flag potential problems for Moody's superiors. While testifying as a witness for Pepsi, Koltalo contradicted his earlier testimony by stating that the terms outcounseled and outplaced were merely employee relations jargon which held no particular meaning. J.A. 225–26.

The issues presented in this appeal are: (1) whether the judgment must be vacated and remanded for a bench trial because of the district court's grant of a jury trial on Moody's untimely motion filed after the court had scheduled the case for a bench trial; (2) whether there were undisputed facts establishing a reduction in force at the Romulus facility making it error for the district court to deny Pepsi's motion for a JNOV on Moody's *Toussaint* claim and his age discrimination claims; (3) whether the district court erred in failing to grant a JNOV or reduce the award of $150,000 for emotional distress; and (4) whether the district court abused its discretion in failing to grant a new trial based on the size of the verdict and the weight of the evidence.

## II.

### A.

We note at the outset that our unpublished order of October 17, 1989, dis-

charging the show cause order did not decide which of the two notices of appeal filed in this case conferred jurisdiction upon this court. We now find it necessary to explain which notice of appeal conferred jurisdiction.

The first notice of appeal was filed in this case on July 28, 1989. That notice served as an appeal from the district court's order of June 29, 1989, which, except for reducing the economic loss award downward from $300,000 to $184,038, denied both Moody's and Pepsi's post-trial motions asking for a JNOV, a new trial, or an amendment of the judgment. At the time the first notice of appeal was filed, Pepsi's July 14, 1989, motion for reconsideration of the order of June 29, 1989, was still pending.

■ Federal Rule of Appellate Procedure 4(a)(4) provides:

If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect.

Thus, Pepsi's and Moody's initial post-trial motions tolled the appeals period until June 29, 1989, the date of the district court's denial of those motions.

■ Motions for reconsideration of a judgment are construed as motions to alter or amend the judgment and are time tolling for the purposes of Rule 4(a)(4). *Kennedy v. City of Cleveland*, 797 F.2d 297, 304–05 (6th Cir.1986), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987). However, "[a] motion to reconsider an order disposing of a [time tolling post-trial] motion of the kind enumerated in ... Rule 4(a)[ (4) ] does not again terminate the run-

ning of the time for appeal," *Dixie Sand and Gravel v. TVA*, 631 F.2d 73, 74 (5th Cir. Unit B 1980) (followed by *Reed v. Toledo Area Affirmative Action Program*, 715 F.2d 253 (6th Cir.1983) (per curiam), *cert. denied*, 469 U.S. 1221, 105 S.Ct. 1207, 84 L.Ed.2d 350 (1985)), unless a grant of the earlier post-trial motion effectively results in a new judgment and the motion to reconsider is filed by the adversely affected party requesting reinstatement of the original judgment. *York v. Tate*, 858 F.2d 322, 326 (6th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1960, 104 L.Ed.2d 428 (1989). Accordingly, we hold that Pepsi's July 14, 1989, motion seeking reconsideration of the district court's order of June 29, 1989, disposing of the parties' motion for JNOV, new trial or amendment of the judgment, did not toll the appeals period. Consequently, Pepsi's first notice of appeal, filed July 28, 1989, was timely and conferred jurisdiction, whereas the second notice of appeal was untimely.

Given our holding that the first notice of appeal was timely and conferred jurisdiction, we feel compelled to recognize that the district court lost jurisdiction over all matters involved in this appeal upon the filing of the first notice of appeal. *See Jankovich v. Bowen*, 868 F.2d 867, 871 (6th Cir.1989). Normally this would mean we would ignore the district court's August 25, 1988, order further reducing the economic loss award; however, at oral argument, counsel for the plaintiff-appellee stated that when the economic loss award was amended downward the second time by the district court, the plaintiff-appellee agreed to the reduced amount. Counsel for plaintiff-appellee further stipulated at oral argument that the reduced amount, *viz.*, $132,-818 was the maximum economic loss proven at the trial. Accordingly, we treat this as an appeal from the district court's order of June 29, 1989, with the economic loss award further reduced to $132,818 per stipulation of the parties.

**B.**

Pepsi argues that the judgment must be vacated and the case remanded because of

the district court's decision to allow the case to be heard by a jury. The record indicates that the case was pending over a year on the non-jury docket pursuant to the district court's scheduling order following Moody's failure to request a jury trial. Pepsi argues that this was a knowing and voluntary waiver of a jury trial and amounted to a stipulation to a bench trial. Pepsi contends that under these circumstances, Federal Rule of Civil Procedure 39 does not give the district court discretion to grant a jury trial. Moreover, Pepsi argues that even if the district court possessed a degree of discretion, it clearly abused that discretion. Relying on Rule 39(b), Moody argues that the district court was acting within the bounds of its discretion in granting a jury trial.

### 1.

■ Where a party has a right to trial by jury, he must demand one within ten days of the last pleading; otherwise a jury trial is deemed waived. Fed.R.Civ.P. 38(d). If a timely demand is made, and a right of trial by jury exists, the court must grant a jury trial unless the parties, by written stipulation or oral stipulation in open court, later consent to a bench trial. Fed.R.Civ.P. 39(a). Under Rule 39(b), "notwithstanding the failure of a party to demand a jury in an action in which demand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any and all issues." "A district court has broad discretion in ruling on a Rule 39(b) motion." *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1013 (6th Cir.1987). Moreover, the court's discretion should be exercised in favor of granting a jury trial where there are no compelling reasons to the contrary. *Id.*

### 2.

■ Pepsi cites *Sewell v. Jefferson County Fiscal Court*, 863 F.2d 461 (6th Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989), for the proposition that the district court had no discretion to grant a jury trial in this case. In *Sewell*, the district court set the case for a non-jury trial. Based on the plaintiff's failure to object until the day of trial, the district court found waiver, and we affirmed holding that the district court's scheduling order was in effect a written stipulation of consent to a bench trial. *Id.* at 465. Pepsi argues that under *Sewell*, Moody must be held to have stipulated to a bench trial.

We do not find *Sewell* controlling. First, *Sewell* was decided under Rule 39(a) which, by its plain language, only applies when "trial by jury has been demanded as provided in Rule 38." Fed.R.Civ.P. 39(a). Second, *Sewell* involved affirmance of the district court's decision to *deny* a jury trial. In *Kitchen* we pointed out that cases involving affirmances of denial of a jury trial furnish no support for reversing a district court's decision to grant a jury trial under Rule 39(b). 825 F.2d at 1013.

Accordingly, we hold that the district court's scheduling order reflecting that the case was set for a non-jury trial did not deprive the district court of discretionary authority under Rule 39(b) to grant a jury trial. We next consider Pepsi's contention that even if the district court did have discretionary authority, it was clearly outside the bounds of its discretion in this case.

■ Pepsi points to the factors identified in *Parrott v. Wilson*, 707 F.2d 1262, 1267 (11th Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983), as the relevant factors to guide a district court's exercise of its discretion. While we do not disagree with the factors set out in *Parrott*, we note that in *Kitchen* it was necessary to discuss only one of the factors set out in *Parrott;* namely, prejudice to the nonmovant. Given the broad grant of discretion under Rule 39(b), the lack of precedent for reversing the grant of a jury trial, the Seventh Amendment right to a jury trial, and the appellant's failure to convincingly show discernible prejudice, we affirmed in *Kitchen*.

Similar considerations apply in this case, as Pepsi's strongest argument showing prejudice is that "a last minute change necessarily prejudices ... parties as their

preparation and discovery would have been different." Appellant's Brief at 24. Pepsi's generic argument is especially unconvincing in this case because the district court took affirmative steps to alleviate any prejudice to Pepsi by granting it additional time for discovery. As we see no prejudice to Pepsi, we hold that the district court acted within the bounds of its discretion when it granted Moody's late demand for a jury trial.

## C.

■ Pepsi argues that the district court should have granted a JNOV in its favor on the substantive claims. Under either Michigan or federal law, failure to grant a JNOV is reviewed de novo asking whether, viewing the evidence and reasonable inferences therefrom in the light most favorable to the non-moving party and without considering the credibility of the witnesses or the weight of the evidence, the only reasonable conclusion is a verdict against the nonmovant. *Erskine v. Consolidated Rail Corp.*, 814 F.2d 266, 269 (6th Cir.1987); *Matras v. Amoco Oil Co.*, 424 Mich. 675, 677, 385 N.W.2d 586, 588 (1986).

■ Pepsi argues that judgment for Moody on the *Toussaint* claim as well as the age discrimination claims is precluded by undisputed proof that there was an economically mandated reduction in force. *See Boynton v. TRW, Inc.*, 858 F.2d 1178, 1184 (6th Cir.1988) (*en banc*); *Matras*, 424 Mich. at 678–79, 385 N.W.2d at 589–90 (economically mandated reduction in force is legitimate nondiscriminatory reason); *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir.1986) (same). Moody responds by arguing that in this case, unlike the cases Pepsi relies on, there was conflicting evidence which would have allowed the jury to find that no reduction in force occurred. Before examining the evidence in detail, we will briefly set out what a plaintiff must prove in order to prevail in an age discrimination action.

■ The plaintiff in an age discrimination case must show that age was "a determining factor" in the adverse employment decision.[3] *Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1180 (6th Cir.1983); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir.1982). A plaintiff raises a rebuttable presumption of discrimination by showing (1) he was a member of the protected class, (2) he received adverse employment action, (3) he was qualified, and (4) he was replaced by a younger person. *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 940 (6th Cir.1987). A plaintiff can also show discrimination by circumstantial evidence. *Blackwell*, 696 F.2d at 1180.

■ Once the plaintiff has made a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory explanation for the adverse actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). When the employer offers a non-discriminatory explanation, then the burden of proving that the proffered reason was pretextual, or not the true reason for the employment decision, shifts to the plaintiff and merges with the ultimate burden of persuasion. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

The plaintiff may carry this burden "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* There are some cases "where the plaintiff's initial evidence [of discrimination], combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10; *Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 50 (6th Cir.1985) (upholding verdict in an ADEA case based on jury's prerogative to conclude that criticisms of employee were not valid); *id.* at 52 (Krupansky, J., concurring)

---

3. We do not conduct a separate analysis for the Elliott–Larsen claim because "[f]or analytical purposes, Michigan's Elliott–Larsen Act resembles federal law, and the same evidentiary burdens prevail as in ADEA cases." *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987).

(making clear that it was enough for the plaintiff to show that the employer's reasons were "unworthy of credence").

Viewing the evidence in this case in the light most favorable to Moody, we believe that the jury could have found that Moody was replaced by a younger man and that the alleged reduction in force was merely a pretext for discrimination. The only evidence Pepsi offered of a reduction in force was documentary evidence of a decline in sales and Koltalo's testimony that he terminated six management employees at the order of his superiors. Koltalo also testified, however, that the organizational charts for the Romulus facility showed forty employees for periods before Moody's termination and thirty-nine employees after. Thus, he admitted, if Moody were reinstated, the number of employees after the alleged reduction in force would be the same as before.

In its reply brief, Pepsi criticizes Moody for offering "confusing and contradictory claims regarding the mass of organizational charts which were introduced at the trial." Appellant's Reply Brief at 4. It is true that the charts are confusing; however, Koltalo's testimony is the only explanation of the charts and his testimony is equally contradictory and confusing.

There is other evidence in this case which could persuade the trier of fact that the reduction in force was merely a pretext. Koltalo testified that Moody was terminated because of a reduction in force; however, the documents reporting the termination indicated that Moody was terminated because he was not doing his job effectively. One of the criticisms of Moody was that he had a 100% turnover rate; however, on cross-examination Koltalo admitted, as earlier stated, that the high turnover rate referred to only four employees, two of whom were terminated years after Moody was terminated. Contrary to Koltalo's testimony that he made the choice as to whom to terminate, Bobbitt testified that Koltalo was ordered by higher management, over Koltalo's objections, to terminate Moody.

Given the inconsistencies in Koltalo's testimony, and the conflicts between his testimony and other evidence of record, the jury could have rejected Koltalo's testimony. Consequently, the jury could have concluded that the personnel plans were, as the name implied and as was suggested by some of the other evidence, prepared in advance of Moody's termination. This inference is supported by Bobbitt's testimony of the Muldoon conversation. Having rejected Koltalo's credibility, the jury could also have taken the reference to ("age") on the personnel plans at face value.

In sum, viewing the evidence in the light most favorable to Moody, we believe that the jury could have concluded that in reality there was no reduction in force, and that a younger man was moved directly into Moody's position. The jury could also have taken the hiring under the Crew Program and the personnel plans as circumstantial evidence of age discrimination. It follows that a JNOV would not have been proper on the age discrimination claims.

In regard to the *Toussaint* claim, Pepsi also relies on the premise that there was an economically mandated reduction in force. Pepsi did not at trial and does not now contest Moody's testimony that Pepsi agreed to terminate only for cause. Given our earlier holding that the jury could have found that Moody was discharged for the impermissible reason of his age, it follows that the jury could have also found that Moody was entitled to recover on his *Toussaint* claim. Consequently, the district court did not err in denying Pepsi's motion for JNOV.

## D.

### 1.

 The jury in this case awarded $150,000 to Moody for emotional distress under his Elliott–Larsen claim. Pepsi argues that allowing emotional distress damages under the state claim would frustrate the remedial scheme of the ADEA, and, therefore, the ADEA, preempts emotional distress damages under the state claim.

We note that this argument was not seriously pressed before the district court. The argument was briefly mentioned during Pepsi's oral motion for a directed verdict to bolster Pepsi's contention that Michigan would not allow recovery for emotional distress on a Elliott–Larsen claim. Otherwise, the argument was buried in a one-paragraph footnote of Pepsi's twenty-five page brief in support of its motion for JNOV or for a new trial. We are unable to find any mention of preemption in the oral argument on Pepsi's motion for JNOV. Given the "well-established principle ... that appellate courts do not address claims not properly presented below," *Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir.1987), we are not inclined to give serious consideration to Pepsi's preemption argument. It suffices to say "that it is our best judgment that because there is no clear statement of Congressional intent to preempt, no requirement upon any party to act in accordance with state law at the risk of violating federal law, and nothing inherent in the nature of age discrimination which requires federal preeminence, this is not an appropriate case for preemption." · *Bailey v. Container Corp. of America*, 594 F.Supp. 629, 633 (S.D.Ohio 1984) (ADEA does not preempt Ohio law which permits recovery for compensatory and punitive damages for age discrimination); *see also Cancellier v. Federated Dept. Stores*, 672 F.2d 1312, 1318 (9th Cir.), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982) (ADEA does not preempt tort damages, including emotional distress, on pendent state claims).

## 2.

■ Alternatively, Pepsi argues that it was entitled to a JNOV on the emotional distress claim because the evidence was insufficient to support the award. Michigan law allows recovery for mental anguish based on the plaintiff's own testimony; however, there must be "specific and definite evidence of [a plaintiff's] mental anguish, anxiety or distress." *Wiskotoni v. Michigan Nat'l Bank–West*, 716 F.2d 378, 389 (6th Cir.1983) (applying Michigan law); *Vachon v. Todorovich*, 356 Mich. 182, 188, 97 N.W.2d 122, 126 (1959).

Pepsi argues that this case presents weaker evidence than that presented in *Wiskotoni*, 716 F.2d at 389, where we reversed the district court's failure to grant a JNOV as to mental anguish. In *Wiskotoni*, the only evidence of mental anguish was the plaintiff's testimony that he moved his entire family from one town to another to protect them from adverse publicity plus his testimony that he could no longer work in banking because of a "funny feeling" that nobody wanted him. 716 F.2d at 389. Pepsi also seeks to compare this case to the testimony which the Supreme Court of Michigan found too vague and uncertain in *Vachon*, 356 Mich. at 182, 97 N.W.2d at 122. In *Vachon* the only evidence of mental anguish plaintiff offered was that she experienced nervousness which was aggravated by the accident underlying the cause of action, and that she sometimes experienced "that feeling" resulting in "those crying spells."

We find more evidence of emotional distress in this case than was presented in *Wiskotoni* and *Vachon*. Moody specifically testified that he was shocked and humiliated, and he explained why. Moody testified of his inability to secure employment after the termination and told how he eventually took a job offered as a favor. Moody later moved away from his family in order to maintain employment, and he testified that he believed the move had an adverse effect on his marriage. Moody's wife testified that he was upset to the point of crying and that he never really overcame the shock and humiliation of the termination.

We find that there is more evidence of emotional distress in the present case than in *Means v. Iowa Security Services*, 176 Mich.App. 466, 468, 471, 440 N.W.2d 23, 25, 28 (1989), which upheld a verdict of $38,900 for lost wages and mental anguish based on the plaintiff's testimony that his inability to secure later employment, his inability to pay his monthly bills, and his failing credit caused him to suffer embarrassment and humiliation. Accordingly, we hold that

there was sufficient evidence of emotional distress in this case to overcome Pepsi's motion for a JNOV.

### 3.

 Pepsi argues that if we uphold the finding of emotional distress, we should order a significant reduction of the $150,-000 award.[4] Pepsi begins by arguing that there is no evidence of ongoing emotional distress. We find no merit in this argument as Moody's wife testified that Moody "still cries, which . . . isn't normal for him."

For authority that this court can substitute its judgment for the jury, Pepsi does no more than invite us to compare the size of this verdict to three other cases. We agree with the Michigan courts that "[a]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries 'which in the abbreviated appellate discussion of them seem somewhat similar.'" *Precopio v. City of Detroit,* 415 Mich. 457, 463, 330 N.W.2d 802, 808 (1982). Moreover, we note that the rationale behind two of the cases cited was not the excessiveness of the verdict but the plaintiff's failure to prove "'the nature and circumstances of the wrong and its effect on the plaintiff.'" *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250, 1259 (6th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986) (quoting *Carey v. Piphus,* 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978)); *see Rodgers v. Fisher Body Div., General Motors Corp.,* 739 F.2d 1102, 1108 (6th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985).

Furthermore, we note that the verdict is not outside the realm of other verdicts upheld by Michigan appellate courts. *See Wilson v. General Motors Corp.,* 183 Mich. App. 21, 31, 454 N.W.2d 405, 415 (1990) (affirming award of $375,000 for emotional distress as remitted by the trial court); *Brunson v. E & L Transp. Co.,* 177 Mich.

App. 95, 101, 441 N.W.2d 48, 54 (1989) (affirming award of $80,000 for emotional distress based on plaintiff's testimony); *Jenkins v. American Red Cross,* 141 Mich. App. 785, 798–99, 369 N.W.2d 223, 230 (1985) (upholding $500,000 award for "noneconomic" damages). Accordingly, we decline Pepsi's invitation to reduce the verdict.

### E.

 Finally, Pepsi argues that the district court should have granted a new trial because the verdict is excessive and against the manifest weight of the evidence. Whether or not a new trial should have been granted is to be decided by federal law. *D.R.C.D.T.,* 816 F.2d at 276. Federal law leaves the decision of whether to reject the jury's verdict in the discretion of the trial judge, and the trial judge's decision will not be reversed absent an abuse of discretion. *Id.*

The preceding analysis has either directly or indirectly considered and rejected Pepsi's arguments concerning the evidence of liability and emotional distress damages. The only new argument is Pepsi's contention that the $300,000 economic loss award is evidence of passion or prejudice, because it exceeded the amount allowable under the law. However, as earlier stated the district court reduced the economic loss award to $184,038 and then attempted to further reduce the award to $132,818, the amount stipulated to at oral argument. Pepsi cites no evidence to show that the economic loss award of $132,818 is legally impermissible. Thus, we find Pepsi's argument for a new trial to be without merit.

### III.

Accordingly, for the reasons stated, the judgment of the district court for emotional distress damages of $150,000 and economic loss damages of $184,038 but reduced by

---

4. Neither party addresses whether this argument should be analyzed under federal law or state law. We need not decide which law to apply since both federal and Michigan courts recognize that the trial court is in the best position to evaluate whether a verdict is excessive,

and both review only for abuse of discretion. *D.R.C.D.T., Inc. v. Integrity Ins. Co.,* 816 F.2d 273, 276 (6th Cir.1987); *Palenkas v. Beaumont Hosp.,* 432 Mich. 527, 528, 443 N.W.2d 354, 355 (1989).

stipulation at oral argument to $132,818 is AFFIRMED.