933 F.2d 1011
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
WILL-O-WHEEL FARMS, Plaintiff-Appellant/Cross-Appellee,
v.
A.O. SMITH HARVESTORE PRODUCTS, INC. (89-1942 and 89-1977),
Blue Water Harvestore Systems, Inc. (89-1942 and
89-1978), Defendants-Appellees/Cross-Appellants.
 Nos. 89-1942, 89-1977 and 89-1978.
 United States Court of Appeals, Sixth Circuit.
 May 24, 1991.
 
 Before KRUPANSKY and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant/cross-appellee Will-O-Wheel Farms ("WOW") appeals from the summary judgment granted after the district court set aside a jury verdict for WOW by granting a new trial.[1] WOW challenges both the order granting a new trial and the summary judgment entered in favor of defendants-appellees/cross-appellants A.O. Smith Harvestore Products, Inc. ("A.O. Smith") and Blue Water Harvestore Systems, Inc. ("Blue Water"). A.O. Smith and Blue Water cross-appeal the district court's denial of their motions for judgment notwithstanding the verdict ("JNOV") in the same order which granted the new trial. For the reasons that follow, we affirm.
 
 I.
 
 2
 WOW is a partnership of brothers James, Dan, and Paul Wheeler engaged in dairy farming in Michigan. After deciding to expand the size of its dairy herd, WOW purchased on February 24, 1982, a large silo from Blue Water that was manufactured by A.O. Smith. Blue Water is A.O. Smith's distributor. The 31' X 89' silo (the "3189") was much larger than its predecessors on the farm and the first of its kind in the state of Michigan.
 
 
 3
 According to the Wheelers, Blue Water representatives told them that the 3189 would work as well or better than smaller A.O. Smith silos and that the farm could expect an overall increase in milk production. Blue Water furnished WOW with detailed projections regarding the 3189's capabilities and the production scenario that could be expected. Nevertheless, the only warranties explicitly made in the purchase order were a warranty of repair or replacement by A.O. Smith and a warranty of proper installation by Blue Water. The purchase order also contained, on its reverse side, a disclaimer of all other warranties and a limitation of remedies excluding any recovery for consequential damages.[2] Also included on the reverse side of the purchase order was a form statement acknowledgment initialed by one of the partners of WOW indicating that he had read and understood the purchase order including "the warranties, disclaimers and terms and conditions herein ..."
 
 
 4
 It is not seriously disputed in this appeal that the unloading device, which came as part of the 3189 system, was defective. Problems with the unloading device necessitated that the bottom access doors of the silo be open an inordinate amount of time. This compromised the air limiting design of the system, creating a potential for damage to feed stored in the silo. The record also shows that the oxygen limiting design was further compromised by the failure of the assembly crew to properly assemble a valve situated in the roof of the silo.
 
 
 5
 WOW's complaints about the unloading device prompted A.O. Smith to reimburse WOW for approximately $49,000 in lease payments on the 3189 silo and furnish WOW with a smaller silo as an interim measure. In return, A.O. Smith required the Wheelers to sign a letter on January 19, 1984, which purported to release A.O. Smith and Blue Water from any consequential damages caused by the 3189 silo "prior to or during the [one-year] period of [the] agreement."[3]
 
 
 6
 As time went on, WOW became even more dissatisfied with the 3189 and abandoned use of it altogether in April of 1985. WOW refused to return the smaller silo and this litigation ensued as a counterclaim to A.O. Smith's action to recover the smaller silo. WOW later filed a Chapter 11 bankruptcy proceeding, and the counterclaims were transferred to the district court for trial. After a jury trial on WOW's counterclaims, the jury returned a verdict for WOW of $1.7 million. The verdict was based upon a finding that the letter executed January 19, 1984, was not intended as a release of claims based on breach of warranty, together with findings of breach of a warranty of merchantability by A.O. Smith and breach of express and implied warranties by Blue Water.
 
 
 7
 Entry of judgment on the verdict was followed by defendants' motions for JNOV, or alternatively, a new trial. In ruling on these motions, the district court rejected arguments that the document executed January 19, 1984, was an effective release and that the disclaimer of warranties and limitation of remedies was effective. The district court further held that WOW's failure to tender consideration given for the release was not fatal since WOW agreed to offset the consideration against the amount of judgment. The district court also found an evidentiary basis for an express warranty by Blue Water.
 
 
 8
 Although the district court declined to grant JNOV on the basis of defendants' arguments that there was insufficient proof that a defect in the 3189 caused lost profits, the district court was persuaded to grant a new trial. The court found "no way to harmonize the verdict" of $1.7 million with WOW's expert's projection that the farm lost profits of approximately $1.1 million. In addition to the fact that the verdict was approximately $600,000 above the maximum calculated by plaintiff's expert, plaintiff's expert projected lost profits into 1988 despite WOW's abandonment of the 3189 silo in April 1985, and WOW's concession that milk production rebounds almost immediately upon curing feed deficiencies.
 
 
 9
 In granting a new trial, the district court cited speculative and conjectural proof of both damages and causation. The district court was highly critical of WOW's proof on causation holding in essence that plaintiff's expert, Dr. Thomas, did not establish "probability ... as opposed to mere supposition or possibility ..." Despite the district court's refusal to grant JNOV on the issue of causation, it later granted summary judgment on the issue citing the same weaknesses as it had noted in ruling on the new trial motion.
 
 
 10
 Material produced during discovery in preparation for a second trial appears to have had little or no effect on the district court's disposition of the case, as the court stated in granting summary judgment, "It ... appears that plaintiff will offer at the second trial the same proofs on the issue of causation as at the prior trial...." The court further stated in granting summary judgment that "proofs at the prior trial were insufficient to support a verdict in plaintiff's favor." More particularly, the district court stated:
 
 
 11
 Dr. Thomas failed to express an opinion on causation in terms of reasonable certainty or reasonable probability. The evidence at the first trial on causation, predicated on Dr. Thomas' opinion, failed to exclude other possible causative factors, so as to provide any basis for apportionment among several hypotheses. Without such basis in the evidence, the proofs on causation were speculative.
 
 
 12
 The proof on causation at the trial came primarily from the testimony of the plaintiff partners and Dr. John Thomas, a nationally recognized expert in dairy cattle nutrition. The partners testified that as soon as they began feeding out of the 3189, milk production dropped. While the 3189 was still in use on the farm, on occasions when the Wheelers purchased and fed silage from a source outside the 3189, they noticed an increase in milk production. According to the Wheelers, when they abandoned use of the 3189 altogether and began feeding their herd from other sources, they witnessed an increase in milk production. Jim Wheeler testified that at "every feeding" from the 3189 he removed blackened, molded feed "by the bushel, basketful." J.A. 954. The other Wheelers also testified about moldy feed coming from the 3189.
 
 
 13
 Thomas described the process whereby excess oxygen causes silage to undergo a chemical reaction which turns the material dark in color and reduces the nutritional value of the silage. Based upon his conversations with the Wheelers and his analysis of WOW's production records, Thomas was of the opinion that the decrease in milk production was caused by the 3189 silo because it "was the principal source of haylage over that time."
 
 
 14
 Thomas saw "no large obvious health problems" and no changes in management which would have accounted for the decrease in production. Thomas noted a correspondence between the decrease in production and use of the 3189, and between an increase in production and abandonment of the 3189. However, in later deposition testimony, Thomas had difficulty tying the increase to abandonment of the silo. In fact, Thomas' deposition indicates that Thomas did not determine the cause of fluctuations in production from October 1984 forward.
 
 
 15
 Thomas admitted on cross-examination that some scholars in his field believe that a sudden expansion of a dairy herd, such as at WOW, creates the type of problems experienced by WOW. Thomas also admitted that he was not sure that the one laboratory sample showing nutritionally deficient feed from the Will-O-Wheel Farm could be attributed to the 3189 silo and that the analytical samples available to him indicated "[t]he material was generally good." Also, on cross-examination, Thomas was led through a litany of factors that could have affected milk production such as adverse weather, health problems in the herd, malfunctioning milking equipment, changed milking practices, time "in milk," and management practices, and Thomas admitted that on most of these factors he had too little information to rule them out.
 
 
 16
 The record also contains evidence that during the last half of March, 1983, Will-O-Wheel Farms had an extensive mastitis outbreak. In January, February, and March of 1983 there was a decline in milk production at the farm. Veterinarian James Turbok testified that mastitis is one of the factors that can be expected to decrease milk production. Thomas did not believe that WOW's mastitis problems were caused by the feed.
 
 
 17
 The principal issues argued by WOW on appeal are (1) whether the district court erred in granting a new trial on the ground that the verdict could not be harmonized with the evidence and (2) whether the district court later erred in holding that the defendants were entitled to summary judgment on the issue of causation. On cross-appeal, both Blue Water and A.O. Smith raise the additional issues of (1) whether the district court erred in holding that WOW's claims were not barred by the release memorialized in the letter executed by the Wheelers on January 19, 1984, and (2) whether the district court erred in refusing to enforce the disclaimer of warranties in the purchase order.
 
 II.
 A.
 
 18
 Our review of a grant of summary judgment or a district court's ruling on a motion for JNOV is de novo. Pinney Dock and Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880 (1988); Moody v. Pepsi-Cola Metro. Bottling Co., 915 F.2d 201, 208 (6th Cir.1990). Summary judgment is controlled by Federal Rule of Civil Procedure 56 and is appropriate where, viewing the facts and inferences in a light most favorable to the nonmoving party, a reasonable jury could not return a verdict for the nonmoving party. 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987). Although WOW's claims are based on Michigan law, the Michigan standard for granting JNOV is essentially identical to the federal summary judgment standard; i.e., appropriate if "viewing the evidence and reasonable inferences therefrom in the light most favorable to the non-moving party and without considering the credibility of the witnesses or the weight of the evidence, the only reasonable conclusion is a verdict against the nonmovant." Moody, 915 F.2d at 208.
 
 B.
 
 19
 We begin our discussion with the release issue because we are persuaded that this issue is, for all practical purposes, dispositive of the case. Defendants argue that this action is barred by the release signed on January 19, 1984, in which WOW agreed to hold defendants "harmless from any alleged claim for damages or consequential losses resulting from the use of their 3189 Harvestore structure and Atlas unloader prior to or during the [one year] period of [the] agreement." Defendants contend that WOW fairly and knowingly released all claims against them. Defendants also assert that there was no basis for the jury to consider the intent of the parties regarding the release because the intent was unambiguously stated within the four corners of the release. Defendants further argue that WOW's claims are barred by its failure to tender the consideration paid for the release prior to or simultaneously with the commencement of the proceedings.
 
 
 20
 In Stefanac v. Cranbrook Educ. Community, 435 Mich. 155, ----, 458 N.W.2d 56, 58 (1990), the Michigan Supreme Court held that
 
 
 21
 when a plaintiff has entered into a settlement agreement tender of consideration recited in the agreement must occur ... in all cases prior to or simultaneously with the commencement of any proceeding raising a legal claim in contravention of the agreement.
 
 
 22
 The court concluded that "this rule is necessary in order to preserve the stability of release agreements." Id. at ----, 458 N.W.2d at 66. The court stated, "The plaintiff is not entitled to retain the benefit of an agreement and at the same time bring suit in contravention of the agreement." Id.
 
 
 23
 In the present case, WOW received approximately $49,000 and use of a 20 X 80 silo in consideration for releasing its claim for damages or consequential losses resulting from the use of the 3189 Harvestore structure and Atlas unloader prior to and during the period of the release agreement. WOW failed to tender the consideration recited in the release prior to or simultaneously with the filing of the present action. The district court held that WOW's agreement to offset the consideration recited in the release against the amount of the judgment was sufficient. Although there was some authority in the lower courts to support the district court's position, Stefanac clearly applies to this case and renders the district court's holding erroneous.
 
 
 24
 WOW contends in its reply brief at page 3 that defendants waived any error in regard to the release because "[a]t no time during his directed verdict motion did counsel for Blue Water request judgment in his client's favor on the basis of a release." See Gutzwiller v. Fenik, 860 F.2d 1317, 1330 (6th Cir.1988) (Fed.R.Civ.P. 50(b) is construed to preclude JNOV unless preceded by motion for directed verdict). The record belies WOW's argument. In arguing for directed verdict, counsel for Blue Water stated, "I feel that the Plaintiff's proofs were insufficient as a matter of law to establish any defense for the validity of that release." Tr. Vol. XI at 1385. At the close of all proof, Blue Water asked for a directed verdict on "the grounds ... raised before and especially the release." Tr. Vol. XVII at 2222.
 
 
 25
 At oral argument, WOW shifted its position somewhat, asserting that defendants only addressed the validity of the release and failed to specifically raise as an issue WOW's failure to tender the consideration. We believe that the failure to tender is an inherent part of the release issue. Under Stefanac, WOW cannot even challenge the validity of the release until it has tendered the consideration paid for the release. We also note that the district judge discouraged elaboration on the grounds raised in support of the directed verdict. Thus, it is perfectly understandable that defendants, who referred specifically to WOW's failure to tender consideration in their answer, their May 1987 summary judgment motion, their requested jury instructions, and their motion for JNOV, did not specifically elaborate on this ground in their motion for directed verdict. Under these circumstances, we are convinced that the purposes of requiring a motion for directed verdict prior to a motion for JNOV have been served. Gutzwiller, 860 F.2d at 1331.
 
 
 26
 WOW also contends that the failure to tender consideration was waived on appeal because it was raised initially in defendants' reply brief. Normally a party is not allowed to hold back an argument until its reply brief and then "ambush" the other party. See Wright v. Holbrook, 794 F.2d 1152, 1156 (6th Cir.1986). This is not a case of "ambush."
 
 
 27
 First, as mentioned earlier, the tender of consideration is part and parcel of the release issue, and under Stefanac WOW is obligated to tender consideration as a condition precedent to challenging the release. Second, Stefanac was not decided until after defendants had filed their initial brief. Thus, by raising Stefanac in their reply brief, defendants were essentially citing supplemental authority. This is permissible under Federal Rule of Appellate Procedure 28(j). Given an attorney's duty of competence (M.R.P.C. Sec. 1.1) and candor to the courts (M.R.P.C. Sec. 3.3), we believe that counsel for WOW may have been obligated to inform the court of the Stefanac case, and we are confident that he was not "ambushed" by the defendants' citing the case in their reply brief.
 
 
 28
 Accordingly, under the Michigan Supreme Court's decision in Stefanac, WOW's failure to tender the consideration bars any and all claims "for damages or consequential losses resulting ... prior to or during the period of [the] agreement"; i.e., prior to January 19, 1984, and continuing through January 19, 1985. Thus, any recovery for lost profits would be limited to those incurred after January 19, 1985.[4] As to the period of time following January 1985, we are persuaded that WOW utterly failed to prove causation. WOW's causation expert, Thomas, was asked specifically about this period of time in the following exchange during a deposition:
 
 
 29
 Q. What caused the--in your opinion, what caused the increase in milk production between October, 1984 and February, 1985, if you can reach an opinion to a reasonable degree of scientific certainty?
 
 
 30
 A. From October on, I don't know.
 
 
 31
 .............................................................
 
 
 32
 ...................
 
 
 33
 * * *
 
 
 34
 Q. Have you determined what caused the milk production to fall between February, 1985 and March, 1985?
 
 
 35
 A. No, sir....
 
 
 36
 .............................................................
 
 
 37
 ...................
 
 
 38
 * * *
 
 
 39
 Q. Didn't milk production rise between March and April, 1985, on the Wheeler farm?
 
 
 40
 A. It [the chart of milk production] so indicates.
 
 
 41
 J.A. 1073-1075. Assuming arguendo that Thomas' testimony was otherwise sufficient to establish that WOW sustained lost production caused by the 3189, we believe that the above testimony effectively admits Thomas' failure to determine whether there was a causative link for the relevant period of time. See Mulholland v. DEC Int'l Corp., 432 Mich. 395, ----, 443 N.W.2d 340, 350 n. 18 (1989) (plaintiff must introduce evidence which shows that conduct of defendant was more likely than not a cause in fact); Hasler v. United States, 718 F.2d 202, 205 (6th Cir.1983) ("[A] conjecture is ... an explanation consistent with known facts ... but not deductible from them as a reasonable inference...."), cert. denied, 469 U.S. 817 (1984).
 
 
 42
 We realize that the above deposition testimony came after the close of the trial; however, it was foreshadowed by Thomas' heavy reliance at trial upon the temporal relationship between the installation of the 3189 and a downturn in production. Thomas was at a total loss at trial when asked to explain specific upturns or downturns in production. That Thomas' opinion was conjectural is illustrated by the following deposition testimony:
 
 
 43
 Q. You say that it's your opinion that the reason milk production fell in September, 1982 from what it had been in May, 1982 was because of feed from the 3189?
 
 
 44
 A. I would say that's one big factor.
 
 
 45
 Q. Are there other factors?
 
 
 46
 A. We don't know.
 
 
 47
 Q. Why not? Have you explored other factors?
 
 
 48
 A. We don't know enough to even explore them so we have to make this one conclusion.
 
 
 49
 Thomas Deposition, January 20, 1989, at 320-21. The conjectural nature of Thomas' opinion is further illustrated by his lack of knowledge of the amount and composition of the rations fed to WOW's herd, and his failure to ascertain whether the one (of ten) protein deficient feed sample originated from the 3189. In fact, Thomas admitted that the analytical reports of feed taken from the farm showed that "[t]he material was generally good."
 
 
 50
 In summary, this matter should not have proceeded to trial with regard to the time covered by the release; i.e., prior to January 19, 1984, and continuing through January 19, 1985. As the consideration paid for the release has never been tendered to the defendants, the release is a complete bar as to that period of time. With respect to the period of time the 3189 silo was used subsequent to the time covered by the release; i.e., January 19, 1985, through April 1985, the plaintiffs utterly failed to prove causation. Therefore, as there was no genuine issue of material fact with respect to the causation issue for the period of time not covered by the release, the district court properly granted summary judgment. Because of our disposition of the case on the above grounds, we need not reach the other issues raised on appeal other than to say that the only abuse of discretion that we find in setting aside the jury's verdict by granting a new trial, if there was an abuse of discretion, was in the failure to grant JNOV.
 
 III.
 
 51
 For the reasons stated, the judgment of the district court is AFFIRMED, although not for the reasons the district court relied upon. Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co., 772 F.2d 214, 216 (6th Cir.1985) (per curiam).
 
 
 
 [1]
 Jurisdiction in the district court was apparently based upon 28 U.S.C. Sec. 1334 which gives district courts original jurisdiction in all civil proceedings "arising in or related to cases under title 11 [of the Bankruptcy Code]."
 
 
 [2]
 The text of the written warranties and disclaimers provides, in relevant part:
 WARRANTY OF MANUFACTURER AND SELLER
 If within the time limits specified below, any product sold under this purchase order, or any part thereof, shall prove to be defective in material or workmanship upon examination by the Manufacturer, the Manufacturer will supply an identical or substantially similar replacement part from the Manufacturer's factory, or the Manufacturer, at its option, will repair or allow credit for such part. The Seller warrants only that the foundation will be properly installed and that the product will be erected in strict conformance with the Manufacturer's specifications....
 * * *
 SECOND DISCLAIMER
 NO OTHER WARRANTY, EITHER EXPRESS OR IMPLIED AND INCLUDING A WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE HAS BEEN OR WILL BE MADE BY OR IN BEHALF OF THE MANUFACTURER OR THE SELLER OR BY OPERATION OF LAW WITH RESPECT TO THE EQUIPMENT AND ACCESSORIES OR THEIR INSTALLATION, USE, OPERATION, REPLACEMENT OR REPAIR. NEITHER THE MANUFACTURER NOR THE SELLER SHALL BE LIABLE BY VIRTUE OF THIS WARRANTY, OR OTHERWISE, FOR ANY SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGE (INCLUDING BUT NOT LIMITED TO THOSE RESULTING FROM THE CONDITION OR QUALITY OF ANY CROP OR MATERIAL STORED IN THE STRUCTURE) RESULTING FROM THE USE OR LOSS OF THE USE OF EQUIPMENT AND ACCESSORIES. THE MANUFACTURER MAKES NO WARRANTY WITH RESPECT TO THE ERECTION OR INSTALLATION OF THE EQUIPMENT, ACCESSORIES, OR RELATED EQUIPMENT BY THE HARVESTORE DEALER, WHO IS AN INDEPENDENT CONTRACTOR, OR BY ANY OTHER INDEPENDENT CONTRACTOR. IRRESPECTIVE OF ANY STATUTE, THE BUYER RECOGNIZES THAT THE EXPRESS WARRANTY SET FORTH ABOVE, IS THE EXCLUSIVE REMEDY TO WHICH HE IS ENTITLED AND HE WAIVES ALL OTHER REMEDIES, STATUTORY OR OTHERWISE.
 
 
 [3]
 The letter, dated January 18, 1984, and executed the next day, provided in relevant part:
 Will-O-Wheel Farms and [A.O. Smith] acknowledge that this agreement shall automatically terminate one year (365 days) from the acceptance date of this document. If, prior to automatic termination, both parties mutually agree that the Atlas unloader consistently delivers 200 pounds of feed per minute, then Will-O-Wheel Farms shall purchase or lease the 20 X 80 Harvestore structure and Goliath unloader ... and this agreement shall terminate....
 Wheelers and [A.O. Smith] acknowledge that this document constitutes the only agreement between the parties and nullifies and makes void any previous agreement between them. Wheelers further agree that, by accepting this agreement and a check for $36,768.60, they indemnify and hold [Blue Water] and [A.O. Smith] harmless from any alleged claim for damages or consequential losses resulting from the use of their 3189 Harvestore structure and Atlas unloader prior to or during the period of this agreement.
 
 
 [4]
 As earlier stated, WOW abandoned the use of the 3189 silo in April 1985. Given WOW's concession that "the adverse effects of bad feed on the cows to whom it is fed is immediately reversed," Appellant's Brief at 35, we are convinced that any hypothetical losses would be limited to the time period between January 19, 1985, and April 1985