[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 16-11090, 15-90031

_____

D.C. Docket No. 2:11-cv-03695-RDP-TMP

DRUMMOND COMPANY, INC.,

Plaintiff - Appellee,

versus

CONRAD & SCHERER, LLP,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 23, 2018)

Before WILSON, JILL PRYOR and BARTLE,[*] Circuit Judges.

JILL PRYOR, Circuit Judge:

_____

[*] Honorable Harvey Bartle III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Drummond, Inc., sued Conrad & Scherer, LLP ("C&S"), a law firm, and its partner, Terrence Collingsworth, for defamation.  In this appeal, C&S seeks interlocutory review of the district court's order concluding that the crime-fraud exception could defeat the firm's and Collingsworth's assertions in discovery of attorney-client privilege and attorney work product protection.  The district court made a preliminary determination that the crime-fraud exception may apply to overcome their assertions of privilege and attorney work product protection and ordered a special master to perform an *in camera* review to determine whether the crime-fraud exception does apply.  Although non-final orders generally are not immediately appealable, the district court certified its order for immediate appeal, and a motions panel of this Court granted C&S permission to bring an interlocutory appeal under 28 U.S.C. § 1292(b).

After full briefing by the parties and with the benefit of oral argument, we conclude that interlocutory review is appropriate to address only one aspect of the district court's order.  We vacate as improvidently granted the motion panel's order in part and elect not to exercise our discretion to review the question posed in that part:  whether the district court erred in applying agency principles to conclude that C&S intended to commit a crime or fraud and created attorney work product or

2

made communications in furtherance of the crime or fraud.[1]  We decline to review this issue because it does not present a pure question of law suitable for review on an interlocutory basis under § 1292(b).  Accordingly, we vacate the motion panel's earlier order in part and deny C&S's petition in part.

We do address the other issue on which interlocutory review was granted, whether the crime-fraud exception may be applied to overcome C&S's assertion, as a defendant in this case, that its materials related to other lawsuits where it served as counsel are protected as attorney work product when the firm's clients in those lawsuits were innocent of any wrongdoing.[2]  This question presents the pure legal issue of whether work product protection may be invoked when a lawyer and law firm are found to have engaged in a crime or fraud but there is no such finding as to the client or clients they represented.  Following our precedent and persuasive decisions from other circuits, we conclude that the crime-fraud exception may defeat work product protection in this circumstance.  We thus affirm the part of the district court's order determining that the crime-fraud exception could be applied

---

[1] As the merits panel, we have the authority to vacate as improvidently granted the motions panel's decision to permit the interlocutory appeal.  *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1253 ("Like all motions initially ruled upon by a motions panel, [an order by a motions panel granting permission for an interlocutory appeal under § 1292(b)] is subject to being vacated as improvidently granted by the merits panel to which the case is assigned for decision."); *see also* 11th Cir. R. 27-1(g) ("A ruling on a motion or other interlocutory matter . . . is not binding upon the panel to which the appeal is assigned on the merits, and the merits panel may alter, amend, or vacate it.").

[2] We note that this issue does not concern materials claimed to be protected by the attorney-client privilege.

3

to overcome C&S's claim of work product protection for materials related to lawsuits where C&S served as counsel despite the fact that its clients were innocent of wrongdoing.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of a complex dispute that began when Collingsworth, a C&S partner, represented Colombian citizens who sued Drummond, an Alabama company, in federal court in Alabama, alleging that Drummond had supported paramilitary groups in Colombia that murdered private citizens.  To provide the necessary context for our discussion, we recount the relevant history of the Colombian citizens' lawsuits against Drummond and Drummond's later lawsuit against Collingsworth and C&S.

### A.    Collingsworth and C&S's Representation of Colombians Suing Drummond

In his law practice, Collingsworth primarily represents victims of human rights abuses.  He joined C&S as a partner to litigate such cases.  Although the firm is based in Florida, he worked out of and managed its Washington D.C. office.

While a partner at C&S, Collingsworth filed on behalf of Colombian citizens several lawsuits (the "alien tort cases") against Drummond, which operates coal mines around the world, including in Colombia.  The plaintiffs sued Drummond under the Alien Tort Statute, 28 U.S.C. § 1350, and the Torture Victim Protection

4

Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note), alleging that Drummond hired members of the paramilitary to provide security services around its mines in Colombia and that these individuals, acting as the agents of Drummond, killed civilians in violation of the laws of nations.  *See generally Doe v. Drummond Co.*, 782 F.3d 576, 579-81 (11th Cir. 2015).

Collingsworth acted as the lead C&S attorney in these cases.  William Scherer, the firm's managing partner, and other C&S attorneys entered appearances in the cases.  As managing partner, Scherer delegated to Collingsworth the authority to litigate the cases.

To support the claims against Drummond, Collingsworth developed evidence connecting Drummond to the paramilitary's violent actions.  He secured testimony from several former members of the paramilitary, including Jairo de Jesus Charris, Libardo Duarte, Jose Gelvez Albarracin, Alcides Manuel Mattos Tabaraes ("Samario"), and Jhon Jairo Esquivel Cuadrado ("El Tigre").  These witnesses offered testimony that implicated Drummond.  Additionally, Collingsworth relied on testimony from Jamie Blanco, who worked as a contractor for Drummond in Colombia.  Blanco testified that Drummond sent him money that he was directed to use to pay the paramilitary for security services.

In the alien tort cases, Drummond sought discovery about whether the plaintiffs or their attorneys had paid or given anything of value to these witnesses in exchange for their testimony.  In response, the plaintiffs identified three witnesses who had been paid—Charris, Duarte, and Gelvez.[3]  The plaintiffs claimed these payments were made to provide security to the family members of the witnesses who were in danger as a result of the witnesses' testimony.  The plaintiffs in the alien tort cases did not identify any payments they made to Samario, El Tigre, or Blanco.

Ultimately, Drummond prevailed in each of the alien tort cases.[4]  But the dispute between Drummond, on the one hand, and C&S and Collingsworth, on the other, was only beginning.

---

[3] The plaintiffs also identified a fourth potential witness who received money from C&S, but C&S stopped paying this potential witness when it determined that he was not credible and would not be used as a witness.

[4] *Balcero Giraldo v. Drummond Co.*, No. 2:09-CV-1041, 2013 WL 3873960 (N.D. Ala. July 25, 2013) (granting summary judgment in favor of Drummond), *aff'd sub nom. Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015); *Baloco v. Drummond Co.*, No. 7:09-CV-00557, 2012 WL 4009432 (N.D. Ala. Sept. 12, 2012) (dismissing case in part and granting summary judgment in favor of Drummond), *aff'd* 767 F.3d 1229 (11th Cir. 2014); Order, *Melo Penaloza v. Drummond Co.*, No. 2:13-cv-393 (N.D. Ala. Jan. 26, 2016), ECF No. 59 (dismissing case with prejudice), *aff'd in part, rev'd in part, vacated in part, and remanded with instructions* 662 F. App'x 673 (11th Cir. 2016).

**B.      Drummond's Defamation Action Against Collingsworth and C&S**

    1.      <u>Drummond Files a Defamation Action and Seeks Discovery About Witness Payments.</u>

While the alien tort cases were pending, Collingsworth wrote letters on C&S stationary to the Dutch government and a Japanese company accusing Drummond of supporting paramilitary groups that murdered hundreds of Colombian citizens. After Collingsworth sent these letters, Drummond sued Collingsworth and C&S for defamation in federal court in Alabama (the "defamation case").

At the beginning of the defamation case, Collingsworth and C&S were jointly represented by outside counsel.  Because of Collingsworth's central role in the underlying litigation and in writing the allegedly defamatory letters, he was the C&S partner primarily responsible for working with outside counsel.  In their joint answer, Collingsworth and C&S denied liability and raised several defenses, including that the statements in the letters were true and that they had not acted maliciously.

Attempting to prove that Collingsworth had known the statements in his letters were false and that he had acted with malice, Drummond served discovery requests about the methods Collingsworth and his litigation team had used in the alien tort cases to secure testimony from the witnesses, including information about any payments made to the witnesses.  Collingsworth and C&S responded that they had previously disclosed all payments made to witnesses, pointing to their

7

disclosures that payments had been made to Charris, Duarte, and Gelvez.  In hearings and other filings with the district court, Collingsworth and C&S's outside counsel repeated that only Charris, Duarte, and Gelvez had received payments.

 2. <u>Through Discovery, Additional Witness Payments Are Uncovered.</u>

As it turns out, all of these statements made in discovery were false.  Eventually, Collingsworth and C&S admitted that El Tigre, Samario, and Blanco had also received payments.  The payments were uncovered after Drummond subpoenaed a law firm that had served as C&S's co-counsel in the alien tort cases.  That law firm produced an email showing that Collingsworth had asked co-counsel and Scherer for permission to pay approximately $100,000 in attorney's fees on Blanco's behalf in a pending criminal case in Colombia.   The co-counsel, copying Scherer, directed Collingsworth not to pay the fees because they would have to disclose these payments in the alien tort cases, which would damage Blanco's credibility and likely be seen as bribery.

Drummond used this email, which Collingsworth and C&S had failed to produce in discovery, to argue that Collingsworth and C&S had been hiding information about witness payments.  A few months later, Collingsworth and C&S admitted that El Tigre, Samario, and Blanco had received payments.

At Collingsworth's direction, C&S had sent and continued to send Samario and El Tigre $1,000 each per month.  C&S wired the money from its operating

8

account to an intermediary in Colombia, who delivered the money to Samario and El Tigre.  C&S began making these payments during the alien tort cases and continued to make them while the defamation case was ongoing.

Multiple partners and employees at C&S were aware of these payments. Shortly after the monthly payments began, Collingsworth sent an email to his co-counsel in the alien tort cases, copying Scherer, informing them that El Tigre and Samario would receive money each month until they were deposed.  This email was forwarded to Scherer's son, another C&S partner, who then apparently had an associate research the propriety of witness payments.  C&S employees who were responsible for sending the monthly wires also were aware that C&S was sending money to the intermediary to pay El Tigre and Samario.

Blanco received no money directly from C&S or Collingsworth; instead, he received money from Albert van Bilderbeek, another Colombian client of Collingsworth's.  After being told by co-counsel not to pay Blanco's attorney's fees, Collingsworth introduced Blanco to van Bilderbeek.  Van Bilderbeek subsequently paid $150,000 of Blanco's legal fees.  While these payments were being made, Collingsworth served as intermediary between Blanco and van Bilderbeek.  At one point, Blanco—waiting for money from van Bilderbeek—told Collingsworth that he would not finalize his declaration until van Bilderbeek paid

him.  After van Bilderbeek paid, Blanco signed a declaration that Collingsworth used in the alien tort cases.

3.    Drummond Seeks Sanctions and Raises the Crime-Fraud Exception.

After C&S and Collingsworth disclosed these additional witness payments, Drummond moved for sanctions, asserting that Collingsworth and C&S had made false statements to the court by failing to disclose these payments.[5]  The court allowed Drummond to depose Collingsworth and Scherer about the witness payments and related issues.

At his deposition, Collingsworth admitted that there had been payments made to witnesses that he and C&S had failed to disclose.  With regard to the payments to El Tigre and Samario, Collingsworth testified that he had forgotten about the payments to the witnesses because they were made through an intermediary.  With regard to van Bilderbeek's payments to Blanco for legal fees, Collingsworth claimed that he failed to disclose the payments because he thought that he had only been asked to identify payments that he made directly to witnesses, rather than payments made by third parties like van Bilderbeek.  Scherer, who was deposed as the representative of C&S, explained that he had not

---

[5] As sanctions, Drummond asked the court to enter a default judgment against Collingsworth and C&S, hold Collingsworth in contempt of court, and award Drummond its reasonable attorney's fees.

10

known about the witness payments and that once he learned of the payments, he made sure that C&S promptly disclosed them to the court.

Although Collingsworth and Scherer provided this general information, they refused to answer many categories of questions posed in discovery, claiming that the information Drummond sought was protected by the attorney-client privilege or the attorney work product doctrine. For example, Collingsworth refused to answer questions regarding communications about the witness payments that he had had with Ivan Otero, a Colombian attorney who served as a conduit for payments from C&S to El Tigre and Samario, or to identify who was involved in drafting the filings in the defamation action that contained misrepresentations about the witness payments. And Collingsworth and Scherer refused to answer questions about what caused them to realize that they had made inaccurate statements about the witness payments or the process that led them to correct their misstatements, claiming the information sought was privileged or protected from discovery. Drummond asked the court to hold that the crime-fraud exception vitiated Collingsworth and C&S's claims of attorney-client privilege and work product protection.

4.    The District Court Applies the Crime-Fraud Exception.

After a hearing, the district court issued an order applying the crime-fraud exception to both Collingsworth and C&S. In reaching this conclusion, the district

11

court followed our circuit's two-part test for applying the crime-fraud exception and determined that Drummond had (1) made a prima facie showing that Collingsworth and C&S had engaged in criminal or fraudulent conduct when seeking the advice of counsel and creating attorney work product in the alien tort and defamation cases and (2) identified categories of communications and attorney work product that may not be protected from discovery because they were used to further a crime or fraud.

First, the district court pointed to evidence that both Collingsworth and C&S had engaged in criminal or fraudulent conduct when they sought the advice of outside counsel in the defamation case and created attorney work product in both the alien tort and defamation cases.  The district court determined that the crime-fraud exception's first prong was satisfied as to three crimes:  fraud on the court, witness bribery, and suborning perjury.  The court emphasized that it was not holding that a crime or fraud actually had been committed, but only that a prima facie case had been established.

In determining that there was a prima facie case of fraud on the court, the district court identified numerous false statements Collingsworth and C&S had made to the court.  The court identified misstatements regarding witness payments that Collingsworth had made to the court in the alien tort cases when he was acting as a C&S partner, as well as misstatements that Collingsworth and outside counsel

12

had made in the defamation action.  The court found that both Collingsworth and C&S had made these false statements knowingly.

In a lengthy footnote, the district court explained that there was sufficient evidence to find that C&S had knowingly made misstatements.  First, the court explained that because Collingsworth was a partner in C&S and was acting for the firm's benefit, his actions and knowledge were attributable to the firm under agency principles.  Second, the court cited evidence showing that other firm partners and employees, including Scherer, had been aware of the monthly payments being made to the witnesses and explained that it was unbelievable that no one at the firm other than Collingsworth had known of the payments.

As for the witness bribery and suborning perjury crimes, the district court determined that Drummond had established a prima facie case with evidence showing that the witnesses had received payments from the litigation team under suspicious circumstances.  The court once again relied on agency principles to establish the prima facie showing that C&S had bribed witnesses and suborned perjury, explaining that every action taken by Collingsworth in the case had been in his capacity as a partner and agent of C&S.

The district court then turned to the second prong of the test, which required a showing that the communication was made or attorney work product was created in furtherance of the criminal or fraudulent activity.  Because the court did not

13

have before it the specific materials that Collingsworth and C&S claimed were privileged or protected from discovery, in lieu of a document-by-document analysis the court considered whether the categories of discovery Drummond sought were sufficiently related to the allegations of fraud, witness bribery, and suborning perjury. The court found that each category of discovery Drummond identified was sufficiently related to the allegations of fraud on the court, witness bribery, and suborning perjury. These categories of information included:

- Collingsworth's communications with Ivan Otero, the Colombian attorney who served as the intermediary for payments from C&S to El Tigre and Samario and from van Bilderbeek to Blanco;

- Collingsworth and C&S's withholding and redaction of documents produced to Drummond in the defamation case showing payments to El Tigre and Samario;

- Collingsworth and C&S's drafting of pleadings and papers in the alien tort and defamation cases that included misrepresentations regarding the scope, nature, and extent of witness payments;

- Collingsworth's email informing Scherer and his co-counsel that Samario and El Tigre would receive ongoing monthly payments and what was done with the email after it sent;

- Collingsworth's communications with attorney Paul Wolf about witness payments;

- Collingsworth's disclosure of payments to El Tigre, Samario, and Blanco to outside counsel in the defamation case;

- Collingsworth's payment of $100,000 to a consulting attorney in Colombia who assisted in obtaining access to prisoners in Colombia in order to interview and depose them in the alien tort cases;

14

- Collingsworth's communications with van Bilderbeek regarding payments to Blanco; and

- Collingsworth and C&S's search for documents in the defamation case.

After determining that the crime-fraud exception may apply, the district court ordered a special master to review *in camera* the documents that Collingsworth and C&S claimed were privileged or protected as attorney work product to determine whether each individual document was in furtherance of or closely related to a fraud on the court or crime and therefore should be produced to Drummond. The court also set forth a procedure for the special master to assess a witness's assertion of attorney-client privilege or attorney work production protection in a deposition. The court directed that when necessary a witness should give *in camera* testimony, potentially *ex parte*, so that the special master could appropriately assess any privilege issues while limiting disclosure only to information used or created in furtherance of the crime or fraud.

After explaining why the crime-fraud exception applied, the district court certified that its order involved controlling questions of law as to which there may be a substantial ground for difference of opinion and that an immediate appeal may materially advance the litigation. In addressing certification, the district court did not identify the specific controlling questions of law that it believed warranted interlocutory review.

15

5.    A Motions Panel of This Court Granted C&S Permission for an Interlocutory Appeal.

Collingsworth and C&S filed separate petitions for review with our Court, seeking permission to file interlocutory appeals from the district court's order. A motions panel denied Collingsworth's petition. A separate motions panel granted C&S's petition as to the following two questions:

1.    Can agency principles be used to impute the application of the crime-fraud exception to an agent's principal where the principal has separately-held privileges as a co-defendant in the suit and there is no finding that the exception applies directly to the principal?

2.    Can agency principles be used to impute the application of the crime-fraud exception to an agent's principal where the agent is operating as an attorney and there is no finding that the client's behavior triggered the crime-fraud exception or that the exception applies directly to the principal?

## II.    BACKGROUND ON THE ATTORNEY-CLIENT PRIVILEGE, ATTORNEY WORK PRODUCT DOCTRINE, AND CRIME-FRAUD EXCEPTION

The issues in this appeal center on how the attorney-client privilege, attorney work product doctrine, and crime-fraud exception apply to a partnership and what role, if any, agency principles play in the application of the crime-fraud exception. To provide context for these issues, we pause for background on the attorney-client privilege and the attorney work product doctrine, as well as the crime-fraud exception.

16

The attorney-client privilege attaches, of course, to confidential communications between an attorney and client for the purposes of securing legal advice or assistance.[6] *See In re Grand Jury Investigation*, 842 F.2d 1223, 1224 (11th Cir. 1987).   The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *United States v. Zolin*, 491 U.S. 554, 562 (1989) (internal quotation marks omitted).

Attorney work product protection extends to material obtained or prepared by counsel in the course of their legal duties provided that the work was done with an eye toward litigation.[7] *See* Fed. R Civ. P. 26(b)(3)(A); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1421-22 (11th Cir. 1994).  Work product protection prevents most inquiries into an attorney's work files and mental impressions. *Hickman v. Taylor*, 329 U.S. 495, 510 (1947).  The purpose of this protection is to protect the integrity of the adversary process by allowing a lawyer to work "with a

---

[6] There are two sets of attorney-client communications claimed to be privileged that are potentially at issue in this appeal.  First, there are communications between C&S and its clients in Colombia in the alien tort cases.  Second, there are communications between C&S and its outside counsel in the defamation case. In the first category, C&S is serving as the attorney; in the second C&S is the client.  With respect to the attorney-client privilege, as opposed to the protections for attorney work product, Drummond seeks discovery of attorney-client privileged materials only from the defamation case—that is, Drummond seeks to use the crime-fraud exception to pierce the attorney-client privilege only with respect to communications where C&S was the client.  We thus do not address whether the crime-fraud exception could apply to privileged communications between C&S and its clients in Colombia, who are not alleged to have participated in any wrongdoing.

[7] With respect to attorney work product, Drummond seeks to discover materials from both the alien tort and defamation cases that C&S claims are protected.

17

certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Id.*

But the protection afforded to work product is not absolute. Discovery may be had into factual work product upon a party showing "substantial need for the materials to prepare its case" and that it "cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A). Greater protection is given to the attorney's opinion work product—that is, materials containing "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Such materials "enjoy[] a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances." *Cox*, 17 F.3d at 1422 (internal quotation marks omitted).

The crime-fraud exception allows a party—in rare circumstances—to obtain discovery that otherwise would be protected by the attorney-client privilege or the attorney work product doctrine. The crime-fraud exception applies when a two-part test is satisfied:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

18

*In re Grand Jury Investigation*, 842 F.2d at 1226.  Stated simply, the crime-fraud exception removes the "seal of secrecy" from attorney-client communications or work product materials when they are made in furtherance of an ongoing or future crime or fraud.  *Zolin*, 491 U.S. at 563; *see Cox*, 17 F.3d at 1422 (recognizing that the crime-fraud exception "applies to work-product in the same way that it applies to the attorney-client privilege").  When the crime-fraud exception applies, an attorney's opinion work product is discoverable.  *Cox*, 17 F.3d at 1422.  With these principles in mind, we now turn to the questions raised in this appeal.

## III.    SCOPE OF INTERLOCUTORY REVIEW UNDER § 1292

The federal courts of appeals "have jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.  "A final decision is one by which a district court disassociates itself from the case . . . ." *Doe No. 1 v. United States*, 749 F.3d 999, 1004 (11th Cir. 2014) (internal quotation marks omitted).  It "ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment." *Id.* (internal quotation marks omitted). "Discovery orders are ordinarily not final orders that are immediately appealable." *Id.*

There are, however, exceptions to the rule that only final decisions are appealable.  We have discretion to hear interlocutory appeals from district court orders under the certification procedure in 28 U.S.C. § 1292(b):

19

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

28 U.S.C. § 1292(b).  We have explained that when deciding whether to permit an appeal under § 1292(b) after a district court has entered an order certifying the appeal and a party has filed a timely application for permission to appeal, we are considering not whether we have jurisdiction to hear the appeal but instead whether to exercise our discretion under § 1292(b).  *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1255 (11th Cir. 2004).

Our precedent identifies several principles to guide us when deciding whether to exercise our discretion under § 1292(b) to allow for a rare interlocutory appeal.  *Id.* at 1264.  In general, we exercise our discretion only when (1) the appeal presents a pure question of law, (2) the question is controlling of at least a substantial part of the case, (3) the district court identifies the question in its order, (4) there are substantial grounds for differences of opinion on the question, and (5) resolution of the question may reduce the amount of litigation necessary on remand.  *Id.*  But even if all of these factors are present, we still have discretion to disallow the appeal.  *See id.*

20

After considering these guiding principles, we conclude that the motions panel improvidently granted permission to appeal, vacate in part that earlier order, and decline to exercise our discretion to decide the first question presented in this appeal. Paraphrased, the first question asks whether a court may apply the crime-fraud exception to a partnership by imputing to the partnership the actions and knowledge of a partner. C&S argues that the district court improperly used agency principles to impute Collingsworth's intent to commit a fraud or crime to C&S in determining that a crime or fraud occurred and that the relevant communications or work product were made in furtherance of that fraud.

At first blush, the core issue of whether, in applying the crime-fraud exception, a court may impute a partner's knowledge and intent to a partnership appears to raise a purely legal question. But C&S concedes that in some circumstances, such as when a firm's managing partner or partner charged with responsibility to make the decisions at issue participates in the fraud, a partner's intent *may* be imputed to the partnership. So it cannot be that this appeal presents the abstract, purely legal issue whether agency principles *ever* may be used to impute a partner's knowledge and intent to a partnership for purposes of applying the crime-fraud exception.

Instead, C&S seeks in effect to have us review whether, given the nature of Collingsworth's relationship with the firm, the record supported the district court's

21

application of agency principles to impute his intent and actions to C&S. This question is not purely one of law about whether agency principles can be imputed for the purpose of applying the crime-fraud exception.

To the contrary, the question posed here requires a fact-specific inquiry into whether the evidence in this case—which showed, at a minimum, that Collingsworth was the C&S partner to whom Scherer, the managing partner, had delegated responsibility for the alien tort cases and who also served as the primary point of contact for the firm's outside counsel in the defamation cases—is sufficient to support the application of agency principles in the crime-fraud context. To answer it would require the court to apply law to the particular facts of the case and thus to take a deep dive into this case's voluminous record. The purpose of § 1292(b) is not to provide interlocutory appellate review of such fact-driven issues. *See McFarlin*, 381 F.3d at 1262. Accordingly, we conclude that permission to appeal on this issue was improvidently granted, and we decline to exercise our discretion to hear an interlocutory appeal related to the first question.

## IV.    LEGAL ANALYSIS

We now turn to the second question raised in this appeal, which we do exercise our discretion to answer. To clarify the question, we rephrase it slightly as follows:

22

> Can the crime-fraud exception be applied to overcome attorney work product protection when the attorney or law firm was engaged in the crime or fraud but the client was not?

With this question, C&S in effect seeks to bar the disclosure of work product materials created in the alien tort actions, claiming that because its clients in those cases were innocent of any wrongdoing, work product protection is maintained despite the firm's participation in the wrongdoing.[8]

We hold that the district court properly concluded that the crime-fraud exception may be applied because illegal or fraudulent conduct by an attorney alone may suffice to overcome attorney work product protection.[9] We have previously recognized that in cases of attorney misconduct there is no protection for the attorney's work product. *See Parrott v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983). In *Parrott*, a party claimed that his attorney's secret recordings of conversations with two witnesses were protected from discovery as work product. *Id.* at 1270-71. We disagreed, concluding that because the attorney's clandestine recordings were unethical,[10] regardless of whether they were work product, they

---

[8] Again, this issue relates only to materials from the alien tort cases, not the defamation case.

[9] We review *de novo* a question certified for interlocutory review under § 1292(b). *Johnson v. City of Fort Lauderdale*, 148 F.3d 1228, 1229 n.3 (11th Cir. 1998).

[10] At the time we decided *Parrott*, an ABA opinion concluded that it was unethical for an attorney to make a clandestine recording, even when such recording was legal under state law. 707 F.2d at 1271 n.19 (11th Cir. 1983). That ABA opinion has since been withdrawn. *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 01-422 (2001). We express no opinion whether an attorney who makes a clandestine recording today acts unethically.

23

were not protected.  We relied on a D.C. Circuit decision recognizing that "in some circumstances, a lawyer's unprofessional conduct may vitiate" the protection afforded to attorney work product.  *Id.* (quoting *Moody v. I.R.S.*, 654 F.2d 795, 799-801 (D.C. Cir. 1981).  The D.C. Circuit explained in *Moody* that "[a]n attorney should not be able to exploit [work product protection] for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent ends."  *Moody*, 654 F.2d at 800.  Based on this rationale, an attorney may not exploit work product protection when she engages in illegal conduct or a fraud upon the court even if her client is innocent.[11]  Of course, for the crime-fraud exception to apply, a court must find that the specific document or testimony that the court is ordering to be produced reflects work of the attorney that was performed in furtherance of the criminal or fraudulent activity or that was closely related to it.

To support its contrary position, C&S cites several cases holding that an innocent client's privilege cannot be overcome by the crime-fraud exception.  But most of these cases consider the scope of the attorney-client privilege rather than

---

[11] Our conclusion today is consistent with the holdings of other circuits that the crime-fraud exception may vitiate the protection afforded attorney work product in cases where an attorney commits a crime or fraud.  *See In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1213-14 (3d Cir. 1989) (allowing crime-fraud exception to overcome work product protection for "materials relating solely to possible criminal activity of [a] law firm"); *In re Doe*, 662 F.2d 1073, 1079 (4th Cir. 1981) (concluding that fraud exception allowed disclosure of work product when the lawyer, not client, was alleged to have engaged in the fraud).

the relationship between the crime-fraud exception and the attorney work product doctrine. *Moody*, the case on which we relied in *Parrott*, warrants further discussion, however.

In *Moody*, the D.C. Circuit recognized that the work product doctrine "create[d] a legally protectable interest in non-disclosure in two parties: lawyer and client." 654 F.2d at 801. The D.C. Circuit explained that "the conclusion that an attorney has no right to object to the disclosure of work product made possible by his misconduct does not necessarily mean that the work product privilege is inapplicable to such documents" because "the client's interest in preventing disclosures about his case may survive the misfortune of his representation by an unscrupulous attorney." *Id.* C&S relies on this reasoning to argue that the crime-fraud exception may not be used to pierce work product protection when the underlying client is innocent because the innocent client may still invoke the doctrine.

We disagree with C&S's position. *Moody* went on to explain that to determine whether an innocent client may rely on the work product doctrine to shield materials after his attorney engaged in a crime or a fraud, "[a] court must look to all the circumstances of the case . . . to decide whether the policy favoring disclosure outweighs the client's legitimate interest in secrecy" and prevent disclosure when it "would traumatize the adversary process more than the

25

underlying legal misbehavior." *Id.*  Rather than adopting a blanket rule that the crime-fraud exception does not apply when there is an innocent client, the D.C. Circuit adopted a balancing test to weigh the client's interest in secrecy against the reasons for disclosure.  Because we agree with the D.C. Circuit's application of this balancing test, the crime-fraud exception may apply to work product when the attorney but not her client is accused of misconduct.[12]  We therefore reject C&S's argument that the client's innocence is an absolute bar to piercing attorney work product protection through the crime-fraud exception.[13]

We resolve the pure legal issue presented in this interlocutory appeal by holding that the crime-fraud exception may be applied to eliminate work product

---

[12] To support its position that the crime-fraud exception cannot apply to overcome work product protection when a client is innocent, C&S also points to several decisions holding that an innocent attorney may invoke work product protection even if his client committed a crime or fraud using his services.  *See, e.g.*, *In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 252 (4th Cir. 2005) ("[T]hose seeking to overcome the opinion work product privilege [using the crime-fraud exception] must make a prima facie showing that the attorney in question was aware of or a knowing participant in the criminal conduct." (internal quotation marks omitted)).  According to C&S, because an innocent attorney may continue to rely on the attorney work product doctrine when his client engaged in a crime or fraud, the converse must also be true:  an innocent client may invoke work product protection even if her attorney committed a crime or fraud while providing services.  We disagree.  C&S's position would, in effect, give an innocent client a right to veto any application of the crime-fraud exception to his attorney's work product.  We cannot agree that a client's interest in preventing disclosures about his case means that the crime-fraud exception may never apply when the attorney, not the client, engaged in misconduct.  Instead, a court must consider the totality of the circumstances to determine whether the policies favoring disclosure of such materials outweigh the client's legitimate interest in secrecy in a particular case.

[13] To the extent that C&S disagrees with the district court's application of the crime-fraud exception under the facts of this case, it would be quibbling with the way that the district court balanced the clients' interests in secrecy against the need for disclosure in these particular circumstances, which would not raise a pure issue of law appropriate for review under § 1292(b).

26

protection based on attorney misconduct when the client is innocent. Accordingly, we affirm the district court's order.[14]

## V.    CONCLUSION

Regarding the first question certified on appeal, we decline to exercise our discretion to answer whether agency principles may be used to apply the crime-fraud exception under the facts of this case. We will not answer this question because it does not present a purely legal question. This Court's earlier order granting permission to appeal is vacated as improvidently granted as to that question, and permission to appeal on that question is denied.

Regarding the second question certified on appeal, we conclude that the crime-fraud exception may in appropriate cases be applied to overcome work product protection based on attorney misconduct, even if the attorney's client is innocent of any wrongdoing. Accordingly, we affirm the district court's order on the crime-fraud exception.

---

[14] On remand, under the district court's order, the special master will perform an *in camera* review of certain categories of documents that C&S and Collingsworth contend are protected by the attorney client privilege or work product protection. To conclude that the crime-fraud exception applies to require disclosure of any specific document, the special master must find that the document either (1) reflects a communication used to further a crime or fraud or was closely related to it or (2) was created to further a crime or fraud or was closely related to it. *See Cox*, 17 F.3d at 1422; *In re Grand Jury Investigation*, 842 F.2d at 1227.

Question 1 is **DECLINED**, the earlier order granting permission to appeal is **VACATED**, and the petition for permission to review is **DENIED**.

Question 2 is **ANSWERED.**